REVISED, March 17, 1998

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**No. 97-40135**
_____

**MELANIE SATTERFIELD,**

**Plaintiff-Appellee,**

**versus**

**WAL-MART STORES, INC.,**

**Defendant-Appellant.**

_____

**Appeal from the United States District Court
for the Eastern District of Texas**
_____

**February 25, 1998**

Before POLITZ, Chief Judge, GARWOOD, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

This appeal turns on whether, under the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. § 2601, *et seq.*, Melanie Satterfield, an "at-will" employee of Wal-Mart Stores, Inc., gave adequate notice of her need for leave, because of an unforeseeable medical problem/condition (pain in side). Wal-Mart appeals a judgment in favor of Satterfield. We **REVERSE** and **RENDER**.

I.

Satterfield was employed by Wal-Mart from late 1992 until mid-1995, when Wal-Mart discharged her for excessive unexcused absences. That October, she filed this action, claiming that Wal-Mart violated the FMLA.

A jury agreed with Satterfield. It awarded her $5,000 in actual damages, but refused to assess liquidated damages.

Post-trial, the district court denied Wal-Mart's motion for judgment as a matter of law (Wal-Mart had also so moved at the close of both Satterfield's case-in-chief and all the evidence) but granted it for Satterfield, increasing the actual damages to approximately $10,000 and awarding liquidated damages of approximately $11,000. It also awarded attorney's fees and costs of approximately $29,000, and ordered Wal-Mart to reinstate Satterfield.

## II.

Wal-Mart maintains that it should have been granted judgment as a matter of law on three independent bases, claiming that Satterfield failed to prove: adequate notice for leave under the Act; the requisite "serious health condition", as defined by the Act; and discrimination, because her excessive unexcused absences are a legitimate, non-discriminatory reason for her discharge. Alternatively, it challenges the sufficiency of the evidence of damages, the constitutionality of the increase in the actual damages award, the award of liquidated damages, the reinstatement order, and the attorney's fee award.

Because we conclude that, as a matter of law, Satterfield's notice of the need for FMLA leave was inadequate, we do not address the other issues.

A.

The Family and Medical Leave Act of 1993 was enacted because Congress found, *inter alia*, "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods". 29 U.S.C. § 2601(a)(4). The purposes of the Act include "balanc[ing] the demands of the workplace with the needs of families" and "entitl[ing] employees to take reasonable leave for medical reasons". 29 U.S.C. § 2601(b)(1) & (2). However, the FMLA seeks to accomplish these purposes "in a manner that accommodates the legitimate interests of employers". 29 U.S.C. § 2601(b)(3); *see also* 29 C.F.R. § 825.101(b) ("The enactment of the FMLA was predicated on two fundamental concerns — the needs of the American workforce, and the development of high-performance organizations.").

The Act applies to private-sector employers of 50 or more employees. 29 U.S.C. § 2611(4). And, an employee is "eligible" for FMLA leave if she has worked for a covered employer for at least 1,250 hours during the preceding 12 months. 29 U.S.C. § 2611(2). It is undisputed that Wal-Mart is a covered employer and Satterfield, an eligible employee.

An eligible employee is entitled to 12 work-weeks of leave in a 12-month period because of, *inter alia*, a "serious health condition" that results in the employee's inability to perform her job requirements. 29 U.S.C. § 2612(a). At the conclusion of a qualified leave period, the employee is entitled to reinstatement to her former position, or to an equivalent one, with the same

terms and benefits. 29 U.S.C. § 2614(a). The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the Act. 29 U.S.C. § 2615(a).

In determining whether an employee's leave request qualifies for FMLA protection, the employer must assess whether the request is based on a "serious health condition", and, for that purpose, may request supporting medical documentation. 29 U.S.C. § 2613; 29 C.F.R. § 825.302(c). The Act defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves[:] (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

One of the regulations promulgated by the Secretary of Labor (approximately two months before Satterfield's discharge) defines a "serious health condition" as

> an illness, injury, impairment, or physical or mental condition that involves:
>
> (1) *Inpatient care* (*i.e.*, an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity (for purposes of this section, defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom), or any subsequent treatment in connection with such inpatient care; or
>
> (2) *Continuing treatment* by a health care provider....

29 C.F.R. § 825.114(a) (emphasis in original).

The regulation goes on to state that "continuing treatment by a health care provider" includes, in pertinent part:

> (i) A period of *incapacity* (*i.e.,* inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
> (A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (*e.g.,* physical therapist) under orders of, or on referral by, a health care provider; or
>
> (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.114(a)(2)(i) (emphasis in original).

When the need for FMLA leave is *foreseeable*, an employee must provide her employer with no less than 30 days *advance* notice. (The type notice considered "advance" notice is a subissue here, as discussed in Part II. C.) If, however, leave is for the birth of a child or the placement of a child with the employee for adoption or foster care and must begin in less than 30 days, "the employee shall provide such notice as is practicable." 29 U.S.C. § 2612(e)(1)&(2)(B); *see also* 29 C.F.R. § 825.302.

On the other hand, the Act is silent as to notice requirements when, as in this case, the need for leave is *unforeseeable*. But, the regulations address this question:

> (a) When the approximate timing of the need for leave is *not foreseeable*, an employee

- 5 -

should give notice to the employer of the need for FMLA leave *as soon as practicable under the facts and circumstances of the particular case.  It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible*.  In the case of a medical emergency requiring leave because of an employee's own serious health condition or to care for a family member with a serious health condition, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved.

(b) The employee should provide notice to the employer either in person or by telephone, telegraph, facsimile ("fax") machine or other electronic means.  Notice may be given by the employee's spokesperson (*e.g.*, spouse, adult family member or other responsible party) if the employee is unable to do so personally. *The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed.  The employer will be expected to obtain any additional required information through informal means.  The employee or spokesperson will be expected to provide more information when it can readily be accomplished as a practical matter, taking into consideration the exigencies of the situation.*

29 C.F.R. § 825.303 (emphasis added).

Our court has considered notice requirements for *unforeseeable leave* only once, in **Manuel v. Westlake Polymers Corp.**, 66 F.3d 758 (5th Cir. 1995).  In that case, pursuant to the employer's "no fault" attendance policy, the employee was warned in February, July, and September 1992 that her absenteeism could result in severe disciplinary action, including termination.  **Id**. at 760.  At the end of December 1992, the employee had missed 14 days of work

in the preceding three months, and was warned again that continued absenteeism could result in suspension or termination. *Id*.

In October 1993, the employee received permission from her supervisor to miss work on a Friday for removal of an ingrown toenail; her doctor had advised her that she could return to work the following Monday. *Id*. Complications developed after the procedure, and the employee contacted her supervisor on the following Monday and told him that she could not return to work because of her toe. *Id*. Keeping in constant contact with her employer, she missed work for more than a month. *Id*. After the employee returned to work, she was suspended for four days and issued a final warning for unsatisfactory attendance, which stated that her employment would be terminated unless she reported to work as scheduled. *Id*. Less than two months later, the employee went home from work after becoming ill. She returned three days later, but was fired because of her persistent absenteeism, including due to the toenail removal. *Id*.

At the time of discharge, unlike in Satterfield's case, the final regulations had not been adopted. The district court granted summary judgment for the employer, holding that the employee's notice of her extended absence due to the toenail was insufficient to trigger protection under the FMLA because the employee did not expressly refer to the Act when requesting leave. *Id*. at 761.

But, our court held that the district court erred by so interpreting the FMLA, and remanded for consideration of whether the employee gave sufficient notice to her employer *of the need* for

- 7 -

FMLA leave. In regard to that issue, our court "decline[d] to announce any categorical rules for the content of the notice by an employee", *id*. at 764, but stated, consistent with the final regulations, quoted *supra*, which had been adopted after the employee's discharge:

> What is practicable, both in terms of the timing of the notice and its content, will depend upon the facts and circumstances of each individual case. *The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.*

*Id*. (emphasis added).

In ***Hopson v. Quitman County Hosp. & Nursing Home, Inc.***, 126 F.3d 635 (5th Cir. 1997), our court, addressing the notice requirements for *foreseeable* — *not unforeseeable* — leave, including whether a "change in circumstances" must be medically-related, stated that, "in a case where the court is asked to apply the standards of a relatively recent statute to *undisputed facts*, it is our opinion that the adequacy of Hopson's notice is a *fact issue*." *Id*. at 640 (emphasis added) (citing **Manuel**).

> What constitutes a "change in circumstances," whether a plaintiff's notice is given "as soon as practicable", and whether the employee has *made a reasonable effort to schedule her treatment so as not to disrupt unduly the operations of the employer* requires an inquiry into the particular facts and circumstances of each case. Such determinations are questions of fact and are better left to the jury with its traditional function of assessing human behavior and expectations.

*Id*. (emphasis added).

Concerning the adequacy of notice of a need for *foreseeable* FMLA leave, this passage could be read to foreclose judgment as a matter of law (or summary judgment, for which the standard is, of course, the same, *see* FED. R. CIV. P. 50, advisory committee note, 1991 amendment, and 56), and, instead, always require a jury determination. But, needless to say, for *unforeseeable* leave, as in the case at hand, the questions are not totally the same (and arguably less complex and less subjective). In any event, we do not read the passage so broadly.

Obviously, the court meant that, even based on the undisputed evidence in *that case*, rational triers of fact could nevertheless differ on whether the advance notice was adequate. *Cf*. **Little v. Liquid Air Corp.**, 37 F.3d 1069, 1075-76 n.14 (5th Cir. 1994) (en banc) (noting that dicta that summary judgment is generally not appropriate in certain types of cases "is essentially empty chatter ... inasmuch as we have never reversed a district court's entry of summary judgment solely because it involved a particular class of allegations", and rejecting "any suggestion that the appropriateness of summary judgment can be determined by such case classification"). In this regard, and as discussed *infra*, other circuits have granted summary judgment for the employer on the question of adequacy of notice for *unforeseeable* FMLA leave. Moreover, although it apparently was not an issue in **Manuel**, which also involved an appeal from a summary judgment, we note, nevertheless, that our court gave no indication that summary

judgment was not an available means for resolving FMLA-notice questions.

Accordingly, to determine whether the district court erred by denying judgment as a matter of law on the notice-adequacy, we must view the evidence and inferences in the light most favorable to Satterfield and determine whether a rational juror could conclude, pursuant to the test established by *Manuel*, 66 F.3d at 764, that the information Satterfield gave Wal-Mart was "sufficient to reasonably apprise it of [Satterfield's] request to take time off for a serious health condition." *See* FED. R. CIV. P. 50; *Boeing Co. v. Shipman*, 411 F.2d 365, 374-75 (5th Cir. 1969) (en banc), *overruled on other grounds*, *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) (en banc); *see also* *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 273 (5th Cir. 1997), *cert. denied*, ___ U.S. ___, 118 S. Ct. 739 (1998).

### B.

It goes without saying that the FMLA makes incredible inroads on an at-will employment relationship, such as Satterfield's with Wal-Mart. For example, as stated in the earlier-quoted pertinent regulation, "[i]n a case of a medical emergency requiring leave because of an employee's own serious health condition ... written advance notice *pursuant to an employer's internal rules and procedures* may not be required when FMLA leave is involved." 29 C.F.R. § 825.303(a) (emphasis added). This notwithstanding, Satterfield's employment history and her knowledge, as well as utilization, of Wal-Mart's rules and procedures concerning leave

- 10 -

and absenteeism provide a backdrop for determining whether she gave sufficient FMLA-notice.

At the commencement of her employment with Wal-Mart in December 1992, Satterfield received an Associate's Handbook and Associate's Benefit Book. She also signed an acknowledgment, stating that she had received a copy of Wal-Mart's policies and procedures and understood that her employment was "on an 'at-will' basis" and that Wal-Mart had the right to "terminate the employment relationship with or without good cause and without prior notice".

The Benefit Book explains how employees can maintain insurance benefits following termination. It also describes the procedures applicable to the different types of leaves of absence available, including medical leave. It states that, if an employee has advance notice that leave will be required, she should submit a Request for Leave at least 30 days prior to the day leave is to begin "or as soon as practical after the associate learns of the need for leave"; and that, for unexpected leave, employees "are required to notify their supervisor as soon as practical but not later than three days after the commencement of the leave".

Even though these procedures pre-dated the FMLA, they are, most interestingly, quite similar to the FMLA and implementing regulations. In fact, it may well be that Wal-Mart was trying to track the FMLA, then in the works, but not signed into law until early 1993. A version of the FMLA was passed in 1990, H.R. 770, 101st Cong., 1st Sess. (1989), but was vetoed by President Bush on 29 June 1990. S. REP. No. 68, 102d Cong., 1st Sess. 67-68 (1991).

The House of Representatives failed to override the veto on 25 July 1990. H.R. REP. No. 135, 102d Cong., 1st Sess., pt. 1, at 18 (1991). Another version was passed in 1992, S. 5, 102d Cong., 1st Sess. (1991); H.R. 2, 102d Cong., 1st Sess. (1991). It was also vetoed by President Bush. A&P S. Doc. 102-26 (22 Sept. 1992). The Senate overrode the veto, 138 CONG. REC. S14841-03 (24 Sept. 1992), but the House did not, 138 CONG. REC. H9930-03 (30 Sept. 1992). In short, the FMLA did not become law until approximately three months after Satterfield began working for Wal-Mart.

Satterfield's personnel file confirms that she was quite familiar with Wal-Mart's policies for leaves of absence. In February 1993, pursuant to Wal-Mart's leave request policy, she requested, and received, medical leave when she had her gallbladder removed; and, in August 1994, she requested, and received, a leave of absence from 22 August through 5 September, in order to locate a new babysitter for her son.

Satterfield's attendance record, included in her personnel file, contains the notation "NS" ("no show") for 28 and 29 May and 3 June, 1995. It is undisputed that these absences were unrelated to the alleged "serious health condition" at issue.

On Friday, 16 June, Satterfield did not report for scheduled work. She testified that, when she awoke that morning, she was having a lot of pain in her right side, which worsened after she remained standing for a long time; that she did not know the cause or probable duration of the pain; and that, because her job as a cashier required her to stand, she did not think she was going to

be able to work that day.  Lacking a telephone, she asked her mother to deliver a note to Wal-Mart management.  According to Satterfield, the note stated that she "was having a lot of pain and ... wouldn't make it in to work that day, and could [she] make up that day on one of [her] days off".  (On cross-examination, Satterfield testified that the note also specified that the pain was in her "side".)  In addition, the note stated that her mother could pick up Satterfield's paycheck.

Satterfield's mother, Jean Grimes, who read the note, testified that it stated "that [Satterfield] was sick and that could I please pick up her check and that could she make up her hours whenever -- on her scheduled off days".  Grimes also testified that she told the store manager, Mark Neighbors, on 16 June that Satterfield was sick, but that she did not know "what was wrong with that girl" because, "[i]f somebody is having pain in that particular area of the body, if it's not appendicitis, then I have no idea what it is"; however, she could not recall whether Neighbors said anything to her during that conversation that indicated he thought Satterfield was sick that day.

Satterfield testified further that, later that day (16 June), she was still having "some pain" and thought she needed to see a doctor; and that, later that afternoon, just before her doctor's office closed, she drove to a convenience store a few blocks from her home and telephoned for an appointment, but the doctor was unable to see her until the following Tuesday, 20 June.

On direct examination, Satterfield testified that she did not recall whether she was scheduled to work on 17-19 June, but that she was not able to work on any of those days because she was "having a lot of pain". On cross-examination, upon being shown the 17-20 June work schedule, Satterfield acknowledged that she was scheduled to work each of those days. She also admitted that, by the afternoon of 16 June, when she scheduled her doctor's appointment, she recognized the possibility that she was not going to be able to work 17-20 June.

Nevertheless, Satterfield testified that, after scheduling that appointment, she did not telephone Wal-Mart from the convenience store on 16 June to notify her supervisor of the status of her condition, or the scheduled appointment, or that she might be out for another four days; *in fact*, *she did not contact Wal-Mart until 28 June*. But, she testified that her mother informed Wal-Mart every day that she would miss work. At odds with this mother-advised-every-day testimony is the mother's (Grimes') testimony that Neighbors informed her *on 16 June* that he had decided to fire Satterfield, but that she did *not* so advise Satterfield.

Satterfield saw her physician on 20 June; he prescribed antibiotics and pain pills. According to Satterfield, her physician also then gave her a written medical excuse, and her mother took it to Wal-Mart; her mother also testified that she delivered a medical excuse to Wal-Mart for Satterfield on 20 June. However, Satterfield's personnel file does not contain a medical excuse dated 20 June. And, on cross-examination, Satterfield

- 14 -

admitted that, after seeing her doctor, she once again did not contact Wal-Mart.

Satterfield next saw her doctor at the emergency room late on 27 June; she testified that, at that time, he told her that she would need surgery. However, neither the doctor's, nor emergency room's, records contain any notations on that date about surgery.

Satterfield testified that the doctor gave her a medical excuse, which her mother took to Wal-Mart. The doctor's excuse, which was introduced into evidence, is dated 28 June 1995, and states that Satterfield had been under the doctor's care "from 6-20-95 [four days after Wal-Mart's decision to discharge her] to date", and "is able to return to work on: indefinite".

Following the 27 June emergency room treatment, Satterfield testified that, on 28 June, she went to the hospital for surgery, but was then informed that her health insurance had been canceled. Because she could not pay for the surgery, it was not then performed. That same day, after becoming aware of the insurance cancellation, Satterfield contacted Wal-Mart's store manager, Neighbors, about her condition and the status of her insurance, and learned that she had been fired.

Several weeks later, in August 1995, Satterfield wrote a letter to Wal-Mart's district manager, Terry Farr, stating that she had spoken with an attorney, who said she should have been covered by the FMLA, and that she was fired for being sick. Satterfield testified that she did not receive a response from Wal-Mart.

Satterfield was treated at the emergency room again on 4 and 10 July and 16 September 1995, and 18 February 1996. But, she did not revisit her doctor in his office until 1 April 1996. On 3 April, after qualifying for Medicaid, she had surgery. She testified that the pain did not bother her after the surgery. (Satterfield's physician did not testify at trial.) In May 1996, she began working part-time for Dairy Queen.

Neighbors, the Wal-Mart store manager, testified that, on 16 June (Friday), Satterfield's mother, who was employed at the same Wal-Mart store, delivered a note to him from Satterfield, which only stated: "Please allow my mother to pick up my check". He testified that, upon receipt of the note, he asked Grimes, "Where is Melanie? Why isn't she coming to work?"; and that Grimes responded, "I don't know what's wrong with that girl". Neighbors, however, did not keep the note.

Neighbors testified further that, because Satterfield's 16 June absence was her fourth failure to report for work in three weeks, he decided to discharge her, in accordance with Wal-Mart's policy, which allows termination for excessive absences. He testified that, in making that decision, he took into account the unexcused absences on 28 and 29 May and 3 June; and that he would not have terminated Satterfield only for missing work on 16 June.

Wal-Mart's records reflect that Satterfield's employment was officially terminated on Monday, 19 June. Satterfield's exit interview form, signed by Neighbors, states in the "Explanation of

Termination" section: "Unreported Absence - didn't call in or show 5/28/95, 5/29/95, 6/3/95, 6/16/95".

In addition, Neighbors testified that he told Satterfield's mother on 19 June (as stated, Grimes testified that this conversation occurred instead on 16 June) that he had decided to discharge Satterfield because of her excessive unexcused absences; according to Neighbors, Grimes did *not* tell him that Satterfield's absence was the result of illness.

Resolving the factual variances in favor of Satterfield, as we must, the evidence establishes that the *only* information Satterfield imparted to Wal-Mart *prior* to its discharge decision was a note delivered to Wal-Mart by her mother on 16 June, advising that she was "was having a lot of pain in her side", and would not be able to work that day, but would like to make it up on one of her days off; and her mother's statement to Neighbors that Satterfield was "sick".  As hereinafter discussed, we conclude that, pursuant to the **Manuel** test, 66 F. 3d at 764, no rational trier of fact could conclude that this was "sufficient to reasonably apprise [Wal-Mart] of [Satterfield's] request to take time off for a serious health condition" within the meaning of the FMLA.

"While an employer's duty to inquire may be predicated on statements made by the employee, the employer is not required to be clairvoyant." **Johnson v. Primerica**, 1996 WL 34148, at *5 (S.D.N.Y. 1996).  Although Satterfield was able to telephone her doctor's office on the afternoon of 16 June and schedule an appointment, she

made no attempt to then contact Wal-Mart to advise of both the status of her condition and that appointment for the following Tuesday, 20 June. *Indeed, she did not contact Wal-Mart until 28 June.*

The 28 June doctor's excuse Satterfield provided Wal-Mart stated that she had been under the doctor's care since 20 June, *after* Wal-Mart had discharged her, and that it was indefinite as to when she could return to work; but, it did *not* state that the condition for which she was being treated necessitated her absence from work on 16 June. As explained, Satterfield and her mother testified that they also provided Wal-Mart an excuse dated 20 June. But, there is no evidence regarding its contents.

Obviously, "[w]hat is practicable, both in terms of the *timing* of the notice and its *content*, will depend upon the facts and circumstances of each individual case." *Manuel*, 66 F.3d at 764 (emphasis added); *see* 29 C.F.R. § 825.303. Other very relevant facts and circumstances at hand include: (1) Satterfield knew how to obtain similar leave from Wal-Mart, because she had requested, and received, leave pursuant to its policies in 1993 and 1994; and (2) in the three weeks preceding 16 June 1995, she had three unexcused absences.

Considering all of these facts and circumstances, no rational trier of fact could conclude that the meager information Satterfield imparted to Wal-Mart on 16 June was sufficient to require Wal-Mart to seek additional information about her condition, and whether it qualified for FMLA protection. *See Cehrs*

*v. Northeast Ohio Alzheimer Research Center*, 959 F. Supp. 441, 449 n.9 (N.D. Ohio 1997) ("While notice to the employer may be informal and need not invoke the FMLA by name, the employer, at a minimum, must receive information sufficient to make it evident that the leave requested is qualifying leave under the FMLA."); *Reich v. Midwest Plastic Engineering, Inc.*, 1995 WL 514851, at *3 (W.D. Mich. 1995) ("at a minimum, an employee must inform her employer of her condition with sufficient detail to make it evident that the requested leave is protected as FMLA-qualifying leave").

It is well to remember that the FMLA is designed only to protect employees when there is a "serious health condition", and only in a manner that "accommodates the legitimate interests of employers". 29 U.S.C. § 2601(a)(4), (b)(3). Requiring an employer to undertake to investigate whether FMLA-leave is appropriate each time an employee, who has been absent without excuse three times in the preceding three weeks, informs the employer that she will not be at work "that day" because she is "having a lot of pain in her side" or is "sick", is quite inconsistent with the purposes of the FMLA, because it is not necessary for the protection of employees who suffer from "serious health conditions", and would be unduly burdensome for employers, to say the least. *See Price v. City of Fort Wayne*, 117 F.3d 1022, 1023 (7th Cir. 1997) ("The goal [of the FMLA] was not to supplant employer-established sick leave and personal leave policies, but to provide leave for more uncommon and, presumably, time-consuming events such as having or adopting

a child or suffering from what is termed a 'serious health condition'.").

The same is true of the information provided after 16 June. It was either too little, or too late, or both. No rational trier of fact could conclude otherwise.

Even though each case obviously turns on its own particular facts and circumstances, we find it instructive, nevertheless, to consider other decisions regarding the adequacy of notice for *unforeseeable* leave. In **Carter v. Ford Motor Co.**, 121 F.3d 1146 (8th Cir. 1997), the court affirmed a summary judgment for the employer, Ford. (As noted *supra*, this is an example of the summary judgment procedure being appropriate, as it must be under the applicable Federal Rules of Civil Procedure, so long as those Rules are satisfied, for FMLA notice-adequacy questions.)

On 16 February 1994, the plaintiff's wife, who was also a Ford employee, telephoned the labor relations office at the plant and stated that she was sick and that she and her husband "were going to be 'out' because of family problems". *Id*. at 1147. Two days later, the plaintiff (husband) was diagnosed as suffering from anxiety and depression, and his doctor concluded that he was totally disabled. *Id*. On 21 February, the plaintiff called the labor relations office and stated that he would be "out sick". *Id*. In response to inquiries, the plaintiff stated that the problem "was personal" and that "he did not know" when he would return to work. *Id*. On 25 February, the plaintiff called the labor relations office again and stated that he was still sick, but he

- 20 -

did not request medical leave at that time.  *Id*.  That same day, the plaintiff received a letter "instructing him to report for work or provide a reason justifying his continued absence within five days"; the letter also warned that failure to comply would result in termination.  *Id*.

On 28 February, the plaintiff went to the Ford plant and requested sick leave; he was given a form for his attending physician to complete as soon as possible to explain the need for such leave.  *Id*.  Although his physician completed the form on 2 March, the plaintiff did not then return it, allegedly based on the labor relations representative's assurance that there was no hurry.  *Id*.  The plaintiff also claimed that his wife telephoned the labor relations office on 2 March to advise that she would soon deliver the document completed by her husband's physician, but that she did not do so because the representative allegedly told her that her husband had already been fired.  *Id*.  Ford discharged the plaintiff on 3 March, for failure to provide medical documentation of the need for leave.  *Id*. at 1148.

As stated, the Eighth Circuit affirmed the summary judgment for the employer, stating that, even assuming the employee had a "serious health condition" within the meaning of the FMLA (which the court considered "doubtful"), the employee did not give Ford adequate or timely notice of his need to take leave because of such condition.  *Id*. at 1148-49.  The notice given to Wal-Mart by Satterfield, that she was "having a lot of pain in her side" and would not be at work on 16 June, is even less informative than

- 21 -

Carter's statements to Ford that he was "sick" and did not know when he would be able to return to work.  Moreover, Satterfield had a history of unexcused absences — three in the three weeks preceding 16 June.  And, again, subsequent notice was either too little, or too late, or both.

Again, consistent with granting summary judgment for notice-adequacy questions, such judgment for the employer was affirmed by the Eleventh Circuit in *Gay v. Gilman Paper Co.*, 125 F.3d 1432 (11th Cir. 1997).  Gay had been warned on five occasions because of tardiness or absenteeism.  *Id*. at 1433.  She worked on 18 June 1994, and was scheduled to return four days later, on 22 June.  *Id*.  However, on 20 June, she was admitted to a psychiatric hospital for treatment for a nervous breakdown.  *Id*.  On 22 June, her husband informed her supervisor by telephone that she was in the hospital "having some tests run".  *Id*.  In his deposition, Gay's husband admitted that he had lied to Gay's supervisor about her whereabouts and condition, and had instructed his sons not to give the employer any information about her condition or location.  *Id*.  The plaintiff did not contact her employer regarding her condition or her absence from work during the following week.  *Id*. at 1433-34.  On 28 June, she was fired for "extended failure to report off, or explain absences".  *Id*. at 1434.

The Eleventh Circuit rejected Gay's contentions that her husband's assertion that she was in the hospital for tests was sufficient to put her employer on notice that her condition was potentially FMLA-qualifying and was, therefore, sufficient to shift

the burden to the employer to make further inquiry as to whether

Gay's absence qualified for FMLA protection.  *Id*. at 1434-35.

> [N]ot only was there a dearth of information provided, but the information that was provided was false.  Gay's husband informed her supervisor that Gay was having some tests run on the first day of her absence from work. When questioned by Gay's supervisor about his wife's condition, Gay's husband deliberately withheld information concerning the true nature of her condition and instructed his sons to do the same.  Under these circumstances, the burden to request further information never shifted to [the employer] because [the employer] could not reasonably be expected to conclude that Gay's absence might have qualified for treatment under the FMLA.

125 F.3d at 1436.

Although Satterfield did not give Wal-Mart false information about her condition, she withheld: (1) the status of her condition on the afternoon of 16 June; (2) the fact that she had scheduled a doctor's appointment for 20 June; and (3) her expectation that her condition would not improve prior to that appointment.  In the light of her previous use of Wal-Mart's leave policy, and her three unexcused absences during the preceding three weeks, Wal-Mart could not reasonably be expected to conclude that Satterfield's absence on 16 June might have qualified for FMLA protection.

The inadequacy of Satterfield's notice to Wal-Mart is even more apparent when compared to that provided by the employee in *Brannon v. OshKosh B'Gosh, Inc.*, 897 F. Supp. 1028 (M.D. Tenn. 1995).  There, the employee informed her employer in advance that her three-year-old daughter was ill and that she might have to miss work if her daughter's condition did not improve; notified her

- 23 -

supervisor by telephone that her daughter was too sick for her to come to work each workday that she was at home caring for her daughter; and submitted a medical note to her employer requesting that her absences from work be excused on the basis of her daughter's illness. 897 F. Supp. at 1032-33. The court concluded that the employer was sufficiently aware that the plaintiff's absence may have qualified under the FMLA and thus was obligated to inquire as to whether her absences were excusable. *Id*. at 1039.

Obviously, Brannon's advance notice and continuous contact with her supervisor were far more detailed than the vague information Satterfield imparted to Wal-Mart. Moreover, unlike Satterfield, Brannon did not have a history of failing to report for work without contacting her employer. *See also* **Price v. City of Fort Wayne**, 117 F.3d at 1025 (employee who filled out employer-provided leave request form, indicated that cause was medical need, and attached doctor's note requiring her to take the time off provided sufficient information to put employer on notice of possible FMLA leave situation).

### C.

The FMLA regulations require covered employers to post on their premises, in conspicuous places, a notice explaining the provisions of the Act and the procedures for filing complaints of violations. 29 C.F.R. § 825.300(a). Along that line,

> [a]n employer that willfully violates the posting requirement may be assessed a civil money penalty by the Wage and Hour Division not to exceed $100 for each separate offense. Furthermore, *an employer that fails to post the required notice cannot take any adverse*

- 24 -

> *action against an employee, including denying*
> *FMLA leave, for failing to furnish the*
> *employer with advance notice of a need to take*
> *FMLA leave.*

29 C.F.R. § 825.300(b) (emphasis added).

As she did in response to Wal-Mart's motion for judgment as a matter of law at the close of all the evidence, Satterfield contends that, because Wal-Mart did not present evidence that it posted the required notice, it was prohibited from firing her, even if she failed to give notice of her need for FMLA leave. We disagree.

In the first place, nothing in the regulations places the burden of proving compliance with § 825.300(a) on the employer. In any event, § 825.300(b) by its own terms, applies only in situations where the employee is required to provide "*advance*" notice of a need for FMLA leave. As discussed *supra*, such *advance* notice is required only when the need for FMLA leave is *foreseeable*; it is not required when, as in this case, the need is *unforeseeable*.

On the other hand, as also discussed *supra*, when the need for leave is *unforeseeable*, an employee is not required to give advance notice. Indeed, on occasion, the employee would *not* be able to give notice in advance. The employee can, instead, give notice after absence from work, provided it is given "as soon as practicable under the facts and circumstances of the particular case". 29 C.F.R. § 825.303(a) ("It is expected that an employee will give notice to the employer within no more than one or two

working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible.").

Again, case law supports our conclusion. *See* **Gay v. Gilman Paper Co.**, 125 F.3d at 1436 n.6 (emphasis added) (rejecting employee's contention that, even if notice provided was insufficient, employer should be estopped from challenging sufficiency of her notice because it failed to comply with posting requirements, because those requirements "do *not* address the notice required in the case of an employee's *unforeseeable need* for FMLA leave"); *see also* **Reich v. Midwest Plastic Engineering, Inc.**, 66 Empl. Prac. Dec. ¶ 43,701, 1995 WL 478884, at *7 (W.D. Mich. 1995) (employer's alleged failure to post notices "would have been relevant only if [employee] had been required to provide advance notice of her intent to take leave").

### III.

For the foregoing reasons, the judgment is **REVERSED**, and judgment is **RENDERED** in favor of Wal-Mart.

*REVERSED and RENDERED*