Reginald O. MOORE, Plaintiff,

v.

UNITED INTERNATIONAL INVESTIGATIVE SERVICES, INC.

and

William J. Guidice, Defendants.

No. Civ.A. 1:01CV1886.

United States District Court, E.D. Virginia, Alexandria Division.

July 10, 2002.

Elaine C. Bredehoft, Reston, VA, for plaintiff.

Robert E. Deso, Jr., Deso, Thomas & Stien, P.C., Washington, DC, for defendants.

### OPINION & ORDER

PRINCE, United States Magistrate Judge.

There is before the Court defendants' Motion For Summary Judgment as to all

five counts of the Amended Complaint, which was argued on June 20, 2002. The counts may be referred as I, the Family and Medical Leave Act (FMLA) claim; II, the defamation claim; III, the interference with business expectancies claim; IV, the breach of contract claim; and V, the conversion claim. At the hearing the Court denied the motion as to all but the FMLA and business interference claims, which were taken under advisement.

### The FMLA Claim

Plaintiff, Reginald O. Moore, was employed by Defendant, United International Investigative Services, Inc. ("UIIS"). Defendant, William J. Guidice, was UIIS's president and chief executive officer. UIIS had a contract with the U.S. Marshal to provide Court Security Officers ("CSOs") for the United States District Court for the Eastern District of Virginia ("EDVa"). Plaintiff was the Site Supervisor for the CSOs in all four divisions of the EDVa, that is, he was the head of the CSOs in EDVa.

According to plaintiff's deposition testimony, in early 2000 he advised his supervisor, Joe Chase, that he needed to take time off some days to care for his ill wife who suffered emphysema, including transporting her to medical appointments. In October 2000, plaintiff's wife was diagnosed as having incurable cancer. This added to the reason for needing time to care for her, and plaintiff so advised Chase. Plaintiff testified that Chase acted favorably to his request for time off so long as it did not interfere with his duties as Site Supervisor. There was never any

discussion between plaintiff and Chase about taking leave of any sort. In fact, plaintiff was of the opinion that as a salaried Site Supervisor the number of hours he worked was in his own discretion.[1]

During January through September 2000, plaintiff submitted his personal Time Sheets to UIIS reporting 77 work days on which he worked fewer than 8 hours.[2] For this same nine month period, he reported taking 13 full days of leave and four partial days of leave. During October through December 2000, he reported 32 days on which he worked fewer than eight hours. He also reported seven full days of leave.

Plaintiff was familiar with the FMLA. In 1999, he submitted to UIIS an application for a CSO under his supervision for FMLA leave. In June 2001, in a memorandum to Site Supervisors, UIIS sent an information package about the FMLA, including a form to be used to request leave under FMLA. Plaintiff concedes that the package was received in his office, but contends that it was never brought to his attention.[3] Although he invested himself with authority to take time off within his own discretion, he also contends that he was never instructed how to apply for leave under the FMLA.

Plaintiff claims that he was terminated in January 2001, in violation of the FMLA. More specifically, he claims that he was fired for taking leave to care for his seriously ill wife. The motion for summary judgment on the FMLA claim is based upon the undisputed fact that plaintiff never formally applied for or requested leave

---

**1.** Plaintiff did not so testify, but the logic of his position with regard to how many hours he worked would have trumped any need to request authority from Chase for time off to care for his wife.

**2.** Not included in the 77 days are a few days of work less than eight hours where work and leave hours combined for eight.

**3.** For the purpose of the motion for summary judgment, the Court finds that plaintiff is charged with knowledge of the information package outlining UIIS's procedures for applying for FMLA leave.

of any sort to care for his ill wife. There is no contention by defendants that the FMLA does not apply otherwise.

■ Two factors of the FMLA must be considered: 1) whether an employee must specifically request leave under the FMLA and 2) how intermittent time off is treated. The FMLA and its regulations address the notice required by an employee to his employer under conditions when the need for leave is *foreseen*. Only the regulations address the notice required when the need is *unforeseen*. In this case, plaintiff's position, although not so stated by him, is that he had foreseen and unforeseen needs. It was foreseen that he needed time to care for his wife; it was generally unforeseen exactly when that need would arise.

The regulations of the FMLA, at 29 CFR § 825.302, raises and answers this question:

What notice does an employee have to give an employer when the need for FMLA leave is foreseeable?

Subparagraph (c) of the answer is as follows:

An employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave. The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed for an expected birth or adoption, for example. The employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken. In the case of medical conditions, the employer may find it necessary to inquire further to determine if the leave is because of a serious health condition and may request medical certification to support the need for such leave.

The regulation at § 825.303 raises and answers the corollary question:

What are the requirements for an employee to furnish notice to an employer where the need for FMLA leave is not foreseeable?

(a) When the approximate timing of the need for leave is not foreseeable, an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case. It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible. In the case of a medical emergency requiring leave because of an employee's own serious health condition or to care for a family member with a serious health condition, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved.

b) The employee should provide notice to the employer either in person or by telephone, telegraph, facsimile ("fax") machine or other electronic means. Notice may be given by the employee's spokesperson (*e.g.,* spouse, adult family member or other responsible party) if the employee is unable to do so personally. The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed. The employer will be expected to obtain any additional required information through informal means. The employee or spokesperson will be expected to provide more information when it can readily be accomplished as a practical matter, taking into consideration the exigencies of the situation.

Finally, because of the nature of the time off taken by plaintiff Moore, one more regulation applies: § 825.203. It provides as follows:

Does FMLA leave have to be taken all at once, or can it be taken in parts?

a) FMLA leave may be taken "intermittently ..." under certain circumstances. Intermittent leave is FMLA leave taken in separate blocks of time due to a single qualifying reason.....

.     .     .     .     .

(c) ....

(1) Intermittent leave may be taken for a serious health condition which requires treatment by a health care provider periodically, rather than for one continuous period of time, and may include periods from an hour or more to several weeks. Examples of intermittent leave would include leave taken on an occasional basis for medical appointments, or leave taken several days at a time spread over a period of six months, such as for chemotherapy....

.     .     .     .     .

(d) There is no limit on the size of an increment of leave when an employee takes intermittent leave....

The Court can not say, leaning only on these interpretive regulations, that the evidence of plaintiff's notice requesting FMLA leave in this case fails to meet the requirements of the FMLA and its regulations. A jury could reasonably conclude from the evidence stated above and the fleshy details supporting it that the time taken off by plaintiff was FMLA-qualifying. However, there is support in the cases as well. In *Manuel v. Westlake Polymers, Corp.*, 66 F.3d 758 (5th Cir. 1995), plaintiff was terminated after her employer established a "no fault" employ-

ment policy designed to ensure that its employees met reasonable attendance standards. It could reasonably be said that before this policy was adopted plaintiff had a poor attendance record. After the new standard was adopted, plaintiff's attendance record remained poor and she was warned that termination was approaching. Shortly after the FMLA became effective, plaintiff received treatment for an ingrown toenail, which required removal of the nail. Infection unexpectedly followed, and plaintiff lost time from work which was unforeseen. She kept in constant touch with her supervisor, but she never requested leave under the FMLA. Indeed, she had never heard of the FMLA. Finally, she was terminated for excessive time off. At the time she was terminated, only interim regulations had been promulgated. As to unforeseen leave, the interim regulations were silent regarding whether an employee must invoke FMLA leave specifically, although the interim regulations for foreseen leave stated that a specific request for FMLA leave was not necessary. The court held that since neither the FMLA nor the interim regulation disclosed congressional will regarding the content of the required notice for unforeseen leave, the Act and the regulation should not be interpreted to require specificity in requesting unforeseen leave but not in requesting foreseen leave. In concluding, the court stated:

What is practicable [notice under the FMLA], both in terms of the timing of the notice and its content, will depend upon the facts and circumstances of each individual case. The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.

*Id.* at 764. This Court believes the Court of Appeals for the Fourth Circuit would find this case persuasive.[4]

---

**4.** In fact, the case was cited in *Robinson v. Overnight Transport,* 110 F.3d 600 (4th Cir., June 9, 1997), an unpublished opinion.

Three years after *Manuel* was decided, the Fifth Circuit gave it and a later case [5] further consideration in *Satterfield v. Wal–Mart Stores, Inc.,* 135 F.3d 973 (5th Cir. 1998). As to *Hopson,* the *Satterfield* court said that a passage in it could be understood to state that the adequacy of notice of a need for *foreseeable* FMLA leave always requires a jury determination, although "we do not read the passage so broadly." Then the court added, "[b]ut, needless to say, for *unforeseeable* leave, as in the case at hand, the questions are not totally the same (and arguably less complex and less subjective.)" Specifically, the court noted that "although it apparently was not an issue in *Manuel* ... our court gave no indication that summary judgment was not an available means for resolving FMLA-notice questions." *Id.* at 977.

The issue in *Satterfield* was the same as in this case: "This appeal turns on whether, under the [FMLA] Melanie Satterfield, an 'at will' employee of Wal–Mart Stores, Inc., gave adequate notice of her need for leave, because of an unforeseeable medical problem/condition (pain in side)." *Id.* at 974. After stating the *Satterfield* facts with exquisite detail, including the conflicting evidence, the court stated:

Resolving the factual variances in favor of Satterfield, as we must, the evidence establishes that the *only* information Satterfield imparted to Wal–Mart *prior* to its discharge decision was a note delivered to Wal–Mart by her mother on 16 June, advising that she [ ] 'was having a lot of pain in her side', and would not be able to work that day, but would like to make it up on one of her days off, and her mother's statement to [the manager] that Satterfield was 'sick' ... [W]e conclude that, pursuant to the *Manuel* test ... no rational trier of fact could conclude that this was 'sufficient

to reasonably apprise [Wal–Mart] of [Satterfield's] request to take time off for a serious health condition' within the meaning of the FMLA.

Quoting again from *Manuel,* the court iterated, "Obviously, '[w]hat is practicable, both in terms of the *timing* of the notice and its *content,* will depend upon the facts and circumstances of each individual case.'" Then, the court stated:

Considering all of these facts and circumstances, no rational trier of fact could conclude that the meager information Satterfield imparted to Wal–Mart on 16 June was sufficient to require Wal–Mart to seek additional information about her condition, and whether it qualified for FMLA protection. *See Cehrs v. Northeast Ohio Alzheimer Research Center,* 959 F.Supp. 441, 449 n. 9 (N.D.Ohio 1997) ('While notice to the employer may be informal and need not invoke the FMLA by name, the employer, at a minimum, must receive information sufficient to make it evident that the leave requested is qualifying leave under the FMLA.'); *Reich v. Midwest Plastic Engineering, Inc.* 1995 WL 514851, at *3 (W.D.Mich.1995) ('at a minimum, an employee must inform her employer of her condition with sufficient detail to make it evident that the requested leave is protected as FMLA-qualifying leave.').

*Id.* at 980–81.

In *Brohm, M.D. v. JH Properties, Inc.,* 149 F.3d 517 (6th Cir.1998), the court held that plaintiff was not an eligible employee under the FMLA because he did not seek medical attention until after he had been terminated. Stating the requirement that an eligible employee must give both notice and a qualifying reason for requesting FMLA leave, the court cited with approval

---

**5.** *Hopson v. Quitman County Hosp. & Nursing Home, Inc.,* 126 F.3d 635 (5th Cir.1997).

*Manuel v. Westlake Polymers Corp.*, *supra*, and quoted what this opinion quoted above from that opinion at page 764.[6]

At oral argument defendants cited *Rocky v. Columbia Lawnwood Regional Medical Center*, 54 F.Supp.2d 1159 (S.D.Fla.1999). The Court has studied that case and is unpersuaded that it supports defendants' motion in this case.. Although it, like the case at bar, is one where plaintiff claimed that she advised her supervisor that she needed time off to care for her ill son and was told by the supervisor that she, the supervisor, would "work with" plaintiff, several factual aspects that separate the cases stand out. First, plaintiff Rocky was not in a supervisory capacity. Her duties in a hospital "included retrieving patient specimens and delivering them to the lab, stocking supplies, cleaning the area, running errands for physicians, and placing orders in the computer." *Id.* at 1162. Secondly, she had been counseled for performance-related problems, including excessive phone calls, conducting personal business while at work, failing to perform her job duties, and leaving the facility for more than thirty minutes without checking out. Thirdly, within a couple of years, plaintiff had received at least five letters for corrective action. One such letter noted that she had failed to contact the personnel department regarding her requested family medical leave, although she had been instructed to do so. Finally, the trial court held that "no rational jury could conclude that the Plaintiff had received the Defendant's permission to be absent or tardy whenever and as often as she desired." *Id.* at 1170.

The Court has also reviewed the case of *Walthall v. Fulton County School Dist.*, 18 F.Supp.2d 1378 (N.D.Ga.1998), cited by defendants at oral argument. The major issue in that case, *i.e.*, the type of leave elected by the plaintiff, upon which the decision is made, is not involved in the case at bar. It requires no further discussion.

Plaintiff has cited *Barron v. Runyon*, 11 F.Supp.2d 676 (E.D.Va.1998). In that case summary judgment was denied defendant, who sought it on the ground that as a matter of law there was no causal connection between plaintiff's termination and his use of FMLA-protected leave. The court stated that the "central [ ] issue is whether an employee who takes intermittent leave under the [FMLA] for a valid medical reason must qualify as an 'eligible employee' each time he is absent from work for that reason, or whether his eligibility must be established only the first time he is absent for that reason." That issue, of course, is present in the case at bar. The court resolved that issue in favor of the employee.[7]

In the case at bar, the evidence taken most favorably to plaintiff is that in early 2000, he notified his superior, Chase, orally that he needed time off now and again to care for his wife who suffered from emphysema; that Chase approved the time off conditioned upon plaintiff's performing all of his supervisory duties; that he did perform all of his duties; that in October 2000, plaintiff advised Chase that his wife needed more care because she had been diagnosed with cancer that was terminable; that Chase approved again; that during the entire year plaintiff turned in monthly reports of his time which clearly indicated that he worked less than full time for a large portion of his duty days in addition to taking 20 full and four partial days of leave; and that he was terminated

---

**6.** See this opinion at 614.

**7.** At the subsequent bench trial of *Barron v. Runyon*, the court made findings of facts and entered judgment for defendant. That judgment was affirmed by the Fourth Circuit at 205 F.3d 1332 (4th Cir.2000), an unpublished opinion.

in January 2001, for taking time off that UIIS was unable to bill to the U.S. Marshal. The adequacy of the timing and content of this information to UIIS as FMLA-qualifying should be determined by a jury.[8]

### The Interference Claim

■ Count III alleges a claim of interference with business expectancy.[9] Specifically, and only, plaintiff claims that he had a business expectancy of employment with the United States Marshal Service ("USMS") following his termination by UIIS that defendants wrongly interfered with.

By letter of January 19, 2001, from Harvey M. Montijo, UIIS's Vice President of Operations, plaintiff was notified that he was terminated for having made some deplorable decisions that were not in the best interest of UIIS. The exhibited termination letter bears no indication that it was sent other than by regular mail.

By letter dated January 18, 2001, from defendant Guidice to Beda Tupay, the Judicial Security Contracts Officer for the USMS, Guidice said he was writing as a follow-up to a telephone conversation on January 3, 2001, between them. The letter indicates that it was sent by "Fax and Federal Express Mail." It also indicates that copies were sent to John Marshall, Director of the USMS, to John Krause, the USMS's contracting officer, to UIISs "Director of Opts," to Deputy U.S. Marshall John Clark, and to a U.S. Congressman Miller. The letter stated that in accordance with the telephone conversation of January 3, between Guidice and Ms. Tu-

pay, which was initiated by the latter, UIIS "has conducted an investigation on the actions and pay records of [plaintiff] and the following is provided for your use." The first item reported was that plaintiff had placed a Richmond CSO on a paid leave of absence from September 1 to October 31, 2000, after it was discovered that she had been drunk on duty, but he had certified to UIIS that she was on duty during that period. The second item reported was that plaintiff, a salaried worker, was paid for 340 hours of service in 2000, as Site Supervisor for which he had not worked.

The letter concluded with two thoughts: 1) an expressed hope that the USMS could understand how UIIS cannot condone this type conduct by a Site Supervisor; and 2) that plaintiff "committed Fraud against the U.S. Marshal's [sic]," and cost UIIS money.[10] The letter ended with, "Your help in this matter is greatly appreciated; if you have any questions call [me]."

Also on January 18, Krause, the USMS's contracting officer, sent what appears to be an E-mail message to USMS Director John Marshall summarizing a telephone conversation of that same day between Ms. Tupay and UIIS's Montijo, in which the latter stated the former would receive a letter before the close of business on January 19, outlining UIIS's investigation of plaintiff.[11] The Krause E-mail to Marshal Marshall also stated that Guidice "called and told us that [plaintiff] cannot be trusted and he does not want him on his payroll." Krause also reported Guidice's con-

---

**8.** This opinion on the FMLA claim was drafted prior to the receipt of Plaintiff's Supplemental Brief in Opposition to Defendants' Motion for Summary Judgment, which the undersigned received on July 9, 2002. No substantive change was made thereafter.

**9.** There is no claim for interference of a contractual relationship.

**10.** The cost to UIIS was said to be $4,927.69, paid to the Richmond CSO while on leave, $9,150.25, paid to plaintiff for hours not worked, and $5,956.96, in reimbursement to the USMS for the time billed for the Richmond CSO.

**11.** That would be the letter of January 18, from Guidice to Tupay summarized above.

cern that by requesting UIIS to justify its intention to terminate plaintiff, the USMS was "in essence interfering with his ability to manage." Krause concluded his E-mail to Marshall as follows:

> If UIIS is correct about [plaintiff] signing in a CSO who was not on duty, that is very serious and fraud against the USMS..... I don't think we should get involved with this until it is thoroughly investigated..... We do not want to be seen as helping someone who is defrauding the USMS by signing in another CSO or who is taking pay for 80 hours of work when not working those hours....

Finally, on March 8, 2001, Guidice wrote a letter to the Federal Bureau of Investigation in Washington, D.C. requesting a review and investigation "into the allegations of fraud and grand theft regarding an employee of [UIIS]." It continued:

> "U.I.I.S. alleges that between January 1, 2000 and December 31, 2000, Mr. Reginald Moore, an employee of the company and site supervisor assigned to the U.S. Marshal's Service–U.S. Federal Court, Alexandria, Va., with the intent to defraud, falsified employee payroll records which resulted in the loss to the U.S. Government and U.I.I.S. of $20,044.90."

Records and reports of UIIS's investigation were enclosed. Copies of the letter were sent to Marshal Marshall, John Krause, Harvey Montijo, John Clark, and Congressman Gary Miller.

The Virginia cases dealing with the tort of interfering with contractual relations, such as *Duggin v. Adams*, 234 Va. 221, 360 S.E.2d 832 (1987), and *Chaves v. Johnson*, 230 Va. 112, 335 S.E.2d 97 (1985), do not supply the correct key to the issue here. Plaintiff concedes that he had no contractual relationship that could have been interfered with. He claims, instead, interference with the expected employment relationship with the USMS.

It was in *Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592 (1984), that the Supreme Court of Virginia first dealt with a claim of interference with a prospective contract.[12] The court said, with no discussion, the "interference must (1) induce or otherwise cause a third party not to enter into a prospective contract with the plaintiff, or (2) prevent the plaintiff from entering into a contract."

Thirteen years later, the Supreme Court of Virginia decided *Maximus v. Lockheed Information Management Systems Company, Inc.*, 254 Va. 408, 493 S.E.2d 375 (1997). There the plaintiff and the defendant were the only bidders on a contract proposal by the Virginia Department of Social Services ("DSS"). Later, DSS issued a Notice of Intent to Award the contract to Maximus. Lockheed filed a statutory formal protest. DSS then canceled the Notice of Intent to Award the contract to Maximus. Maximus filed an

---

**12.** Although the Virginia court stated in that case that the "cause of action arises from an intentional, improper interference with another's contractual relations," it clearly was dealing with interference of a business expectancy. It cited Annot. 6 A.L.R.4th 195 (1981), which discusses business expectancy cases, and *Fairmont Foods Co. v. Manganello*, 301 F.Supp. 832, 838 (S.D.N.Y.1969) ("The trier of facts may find that the negotiations between plaintiff and the shareholder defendants never reached the stage of contractual agreement and yet, nonetheless, might find these two defendants liable to plaintiff for tortious interference with pre-contractual relations." See, also, *Selman v. American Sports Underwriters, Inc.*, 697 F.Supp. 225 (W.D.Va.1988) ("the plaintiff asserts a common law claim based upon the defendants' tortious interference with his prospective economic relations. This cause of action [was] first recognized in Virginia in the case of *Allen Realty Corp. v. Holbert*.")

action against Lockheed alleging that it had tortiously interfered with its contract expectancy with DSS. At the trial, at the conclusion of Maximus' case in chief, the trial judge granted Lockheed's motion to strike plaintiff's evidence and to enter summary judgment for Lockheed on the ground that Lockheed had a qualified privilege,[13] and Maximus failed to meet the shifted burden of proving Lockheed's malice or improper conduct so egregious as to override the qualified privilege. Without a nod to *Allen Realty Corp. v. Holbert, supra,* the court said:

> Our prior cases, however, have not addressed the level of protection or the elements of a cause of action attaching to the business interest at issue in this case, a contract expectancy. The Restatement (Second) of Torts § 766B (1977) describes the cause of action as follows:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

> (b) preventing the other from acquiring or continuing the prospective relation.

The Restatement is strikingly like the statement in the *Allen Realty Corp.* case. After briefly discussing the "virtual identity of interests and the legal ability to enforce those interests in a contract terminable at will and a contract or business expectancy," the court listed the proof needed to establish a prima facie cause of action in a claim of interference with a business expectancy as follows:

> 1) Plaintiff had a contract expectancy;

> 2) defendant knew of the expectancy;

> 3) defendant intentionally interfered with the expectancy;

> 4) defendant used improper means or methods to interfere with the expectancy; and

> 5) plaintiff suffered a loss as a result of defendant's disruption of the contract expectancy.

> Plaintiff is not required to show malice or any other egregious conduct.

Although here the Supreme Court has lightened a plaintiff's burden in establishing a prima facie case of liability, plaintiff Reginald Moore does not meet it. His evidence is insufficient to carry the burden of proving the first step, that is, that he had a business expectancy with the USMS. His own self-serving statements do not carry the day. None of the evidence presented suggests that the USMS expected or intended to offer plaintiff a job. The day before plaintiff was terminated, John Krause advised John Marshall, the Director of the USMS, that the USMS should not get involved in the controversy between UIIS and plaintiff until it was investigated. Plaintiff's contention that because the USMS was concerned enough about the prospective termination of himself that they asked defendants to explain why they would terminate him should be understood as the last immediate step before they offered him a job, is just too speculative to prove that there was a business expectancy. The evidence of an expectancy must establish expectancy by and between two parties at least, based upon something that is a concrete move in that

---

**13.** The trial record did not disclose the basis for the determination of the nature of the qualified privilege.

direction. Here, there is only plaintiff's hope. That a year and a half has passed since his termination without an offer of employment by the USMS cannot establish that there was an expectancy of employment by and between him and the USMS at any time.

■ There is no evidence, either, to establish step 2, that is, that defendants knew of the claimed expectancy. As previously stated, the USMS's concern that UIIS may terminate plaintiff and its interest in trying to intervene in his behalf, are not proof that defendants then would know that those acts of concern and interest would establish between plaintiff and the USMS an expectancy of a business relationship, which would be interfered with if defendants proceeded with the termination. It is inconceivable that in the short time that the USMS sought and received defendants' explanations of the intention to terminate and the reasons for the termination, all of which occurred on January 18 and 19, that a business expectancy would become known or should have become known by defendants which they, at their risk, would be liable for interfering with if they terminated plaintiff and explained why.

The third step of plaintiff's prima facie case is proof that defendants intentionally interfered with the business expectancy. There is no evidence to support this factor. Nowhere in the letter of January 18 to Tupay, nowhere in the memo of the telephone conversation on January 18, and nowhere in the letter of March 8, do defendants express any effort or intention to cause the USMS not to hire plaintiff, nor to prevent plaintiff from acquiring that employment. The only intentions exhibited are not to continue plaintiff's employment and not to accede to pressure by the USMS to continue that employment.

In step 4, plaintiff must prove improper means to carry out its intention to interfere. Because there is no evidence of intention to interfere, this aspect of the analysis does not come into play.

Step 5 needs no discussion at this point.

### ORDER

For the reason stated in open court on June 20, it is **ORDERED** that defendants' Motion For Summary Judgment as to Counts II, IV and V is **DENIED.**

It is **FURTHER ORDERED,** for the reasons stated herein, that defendants' Motion For Summary Judgment as to Count I is **DENIED;** and defendants' Motion for Summary Judgement as to Count III is **GRANTED.**

The Clerk is requested to mail a copy of this Opinion and Order to all counsel of record.