**Wendy BORISKI, Plaintiff,**

v.

**CITY OF COLLEGE STATION, Defendant.**

**No. Civ.A. H–98–847.**

United States District Court, S.D. Texas.

Sept. 14, 1999.

494

Robert S DuBoise, DuBoise Hengst and Henderson, Houston, TX, for Wendy Boriski, plaintiff.

Tom M Davis, Jr, Davis & Shank, Houston, TX, Marshall Harvey Cargill, Jr, College Station, TX, for City of College Station, defendant.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendant City of College Station's ("College Station" or "the City") Motion for Summary Judgment (# 18). College Station seeks summary judgment on Plaintiff Wendy Boriski's ("Boriski") claims under the Family and Medical Leave Act of 1993, ("FMLA"), 29 U.S.C. §§ 2601–2654. Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that summary judgment should be granted.

## I. *Background*

Boriski, also known as Wendy Leinhart and Wendy Leinhart–Boriski, was employed by the City in various positions between 1989 and 1996. On March 27, 1989, she began working part time for the College Station Parks Department and was subsequently employed in a full-time capacity on May 14, 1989. In July 1989, Boriski was promoted to the position of utility clerk in the College Station Water and Sewer Department, was again promoted on August 1, 1990, to the position of secretary within the same department, and, in 1993, was promoted to the position of senior secretary in the department. On December 1, 1994, she was promoted to the position of operations assistant (database administrator) in the College Station Water/Wastewater Department and was given a raise. At the time of her departure from the City, she was paid an annual salary of $22,800.00.

As an operations assistant in the Water/Wastewater Department, Boriski's primary responsibilities included maintaining the computer database, collecting and inputting data, and working with the personnel who created maps. When she started in this position, her supervisor was Robert Gadbois, and, later, she was supervised by Susan Sharp and Bill Riley ("Riley"). Eventually, Jeff Koska ("Koska") became her immediate supervisor. In May 1995, Koska was named the water superintendent for College Station and remained in that position throughout the balance of Boriski's employment. Riley, the wastewater manager, was Koska's supervisor.

In late 1994 or early 1995, Boriski injured her left shoulder in a deer hunting accident. On January 30, 1995, Dr. Mark Riley ("Dr.Riley") diagnosed her condition as "subacromial bursitis and rotator cuff tendinitis" for which he prescribed rest, heat, restricted activities, and certain medications. In late February 1995, Boriski exacerbated her prior injury in an automobile accident. Dr. Riley continued to treat

her for shoulder problems until at least June 16, 1997.

Boriski alleges that on January 30, 1995, following the deer-hunting incident, she returned to work with her left arm in a sling. She asserts that she informed Riley or Koska of her limitations and requested several modifications to her job including: assistance from other office personnel in bending, stooping, and lifting items; having job orders brought to her desk rather than having to retrieve them; assistance with typing; and permission to elevate and rest her arm as necessary. She maintains that all of these requests were denied. Boriski also alleges that Koska denied her request to adjust her work schedule so that she could attend physical therapy, resulting in her having to use sick leave or vacation time to go to therapy. She additionally claims that Koska "continually harassed [her] about using sick leave and vacation leave to attend therapy sessions and in October of 1995 he gave [her] a written reprimand stating that [she] had engaged in inappropriate use of sick leave." Koska recalls working with Boriski to ensure that she could do her job properly despite her injury and maintains that he allowed Boriski to take the necessary time off for therapy. He further contends that although he reprimanded her on October 20, 1995, for improper use of sick time, he was not referring to instances in which she received physical therapy but to time taken off from work when it was not "absolutely necessary." At deposition and in her answers to interrogatories, Boriski identified only one specific instance, on April 7, 1996, approximately six months after the reprimand, when her request to attend physical therapy was denied. Boriski's subsequent deposition testimony revealed that she was not actually denied the opportunity to obtain physical therapy, but was merely "denied the schedule that the doctor and the physical therapist requested for [her] for a given week."

On October 23, 1995, Boriski filed a grievance with Riley regarding Koska's reprimand, and on December 11, 1995, Boriski complained to Riley that Koska had harassed her by verbally abusing her, screaming at her, and lunging at her. Riley denied her grievance in a written memorandum, but on February 8, 1996, Riley's supervisor, John Woody ("Woody"), agreed to remove the reprimand from Boriski's file.

Boriski asserts that she was subjected to further harassment during early 1996. She alleges that in February 1996, Koska ordered her to punch a time clock even though other employees at her level in the department were not required to do so. She further contends that in March 1996, Lawrence Carter, another of her supervisors, began questioning her spouse as to her health and whereabouts. She also maintains that during the same month, Koska and Riley discussed her personal and medical business during staff meetings. Finally, Boriski alleges that in April 1996, Riley ordered her not to attend staff meetings which she had always attended, eliminated the ordering of office supplies from her job duties, forbade her from answering the telephones of other employees who were away from their desks, and threatened to terminate her if she took time off from work to attend therapy.

On April 11, 1996, Boriski sent a letter to Karen Pavlinski ("Pavlinski") in the City's Human Resources Department, notifying her that she had been under a doctor's care for an injury, that she would need more therapy and possibly surgery, and that she was "seeking protection under the ADA Law [the Americans with Disabilities Act]." On April 22, 1996, Pavlinski sent Boriski a memorandum acknowledging the letter and seeking clarification as to whether she was requesting an accommodation and, if so, the type of accommodation needed. Pavlinski also asked Boriski to provide information from her physician documenting her impairment and limitations. In response, Boriski submitted a letter dated April 23, 1996, from Dr. Riley, stating:

To Whom It May Concern:

Wendy Leinhart has been under my care for intermittent problems with her left shoulder and neck. She has signs of subacromial bursitis and rotator cuff tendinitis of her left shoulder. Initially, her problems began without an injury, but her symptoms have been aggravated by a car accident. They have significantly limited her on an intermittent basis. This is especially true with regards to overhead reaching and grabbing and lifting activities.... I am hoping that her symptoms will ultimately resolve with conservative treatment, but it is possible she could ultimately require surgical treatment if she has recurrent problems.

Dr. Riley also explained that "[f]or at least the next 6–12 months I think she should avoid repetitive overhead reaching, pulling, or lifting more than 20 lbs." and noted that if she had more frequent or persistent episodes, surgical treatment could be necessary in the future. Subsequently, in May 1996, Boriski requested and was granted a leave of absence for "shoulder surgery & recovery" for the dates May 13, 1996, through May 28, 1996. On June 21, 1996, the Human Resources Department directed a memorandum to Boriski designating her leave of absence as "Family/Medical Leave" under the FMLA.

Boriski claims that after she requested the leave of absence in May, Koska harassed her by yelling at her and demanding doctor's notes from her in front of other employees. She further alleges that Koska ordered her to train another employee, Amy Carter ("Carter"), to do her job, causing her to believe that she would soon be fired and Carter would replace her.

Following her surgery on May 13, 1996, Dr. Riley released Boriski to return to work on May 29, 1996, with her arm in a sling and a medical restriction that she perform no lifting, pushing, or pulling with her left arm. Boriski contends that upon her return from leave, she experienced further harassment. She alleges that Koska removed her from all work-related committees, questioned other employees as to her whereabouts whenever she left her desk for a few minutes, and sent Carter to attend an annual seminar relating to the database software that she had previously attended. Boriski also claims that Riley requested copies of all medical records relating to her leave merely to see if she had any. On July 10, 1996, Boriski filed a grievance with Woody, alleging that Koska and Riley were harassing her and creating a hostile work environment. She also complained that she was being discriminated against due to her gender and that she was being retaliated against for filing a previous grievance about an incident of unauthorized absenteeism. Woody denied her grievance on August 2, 1996. Boriski maintains that after she filed this second grievance, Riley threatened to terminate her if she did not refrain from complaining to the Human Resources Department.

Boriski asserts that "[t]he final straw came in July of 1996 when she informed Mr. Koska that she needed to leave work early to attend a medical appointment." According to Boriski, "Mr. Koska told [her] that if she left work, she would be fired." On July 22, 1996, either the same day or the following day, Boriski tendered a letter of resignation stating that she was "leaving the City to enhance [her] career further" and that her last day would be July 31, 1996. College Station considered her resignation to be effective July 29, 1996, her last day of work, as reflected in a document dated that day, entitled Employee Request Form, stating, "Wendy resigned her position on July 29th, at 12:30pm when she left the work site with the intention of not returning before the 31st."

Prior to the effective date of her resignation, Boriski accepted a position as an assistant regional sales manager with Hansen Information Technologies ("Hansen") at a salary of $38,000.00 per year, which was subsequently increased to $50,000.00 per year. Boriski worked in that capacity through June 1998, when she was terminated after a corporate reorganization and

the closure of the Texas office. She also worked concurrently for Leigh Engineering from March 1997 until June 1997, when she resigned because she "didn't like the way they ran their business." Boriski was unemployed from July 1998 through September 15, 1998, at which point she was hired as a juvenile correctional officer at the Hamilton State School for $1,437.00 per month. She resigned from that position on November 2, 1998, on the grounds that the facility was severely understaffed and that she feared juvenile violence. From February to May 1999, Boriski worked for an attorney, Ann Braneff, as a legal assistant, earning $1,734.00 per month. Then, in May 1999, she began working as a temporary employee for Agency Management Services, earning $9.50 per hour. Boriski asserts that none of these other positions provided paid benefits.

In August 1996, Boriski's attorney forwarded a letter to the Equal Employment Opportunity Commission, which was followed by a more formal charge of discrimination in May 1997. On March 28, 1998, Boriski instituted this action against College Station alleging unlawful retaliation under the FMLA, contending that the actions of her supervisors leading up to her termination were in retaliation for her requesting and taking a leave of absence under the FMLA. She also asserted claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12113, but subsequently dismissed those claims. On July 1, 1999, College Station filed the instant motion for summary judgment.

## II. *Analysis*

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P.

56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Colson v. Grohman,* 174 F.3d 498, 506 (5th Cir.1999); *Marshall v. East Carroll Parish Hosp. Serv. Dist.,* 134 F.3d 319, 321 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n,* 123 F.3d 321, 324 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998). The moving party, however, need not negate the elements of the nonmovant's case. *See Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996) (citing *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *See Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Colson,* 174 F.3d at 506; *Marshall,* 134 F.3d at 321–22; *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075. All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.,* 98 F.3d 179, 181 (5th Cir.1996) (citing *Lindsey v. Prive Corp.,* 987 F.2d 324, 327 n. 14 (5th Cir.1993)); *see Colson,* 174 F.3d at 506; *Marshall,* 134 F.3d at 321; *Messer v. Meno,* 130 F.3d 130, 134 (5th Cir.1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 794, 142 L.Ed.2d 657 (1999);

*Hart v. O'Brien,* 127 F.3d 424, 435 (5th Cir.1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999); *Songbyrd, Inc. v. Bearsville Records, Inc.,* 104 F.3d 773, 776 (5th Cir.1997). " 'The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Reves v. Ernst & Young,* 507 U.S. 170, 190 n. 3, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (quoting *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505); *Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990); *see Marshall,* 134 F.3d at 321. Nonetheless, " 'only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party.'" *Eastman Kodak Co. v. Image Tech. Servs.,* 504 U.S. 451, 469 n. 14, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (emphasis in original). "If the [nonmoving party's] theory is . . . senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Id.* at 468–69, 112 S.Ct. 2072.

The nonmovant's burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or "only a scintilla of evidence." *Little,* 37 F.3d at 1075; *see Hart,* 127 F.3d at 435; *Wallace,* 80 F.3d at 1047; *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)); *State Farm Life Ins. Co. v. Gutterman,* 896 F.2d 116, 118 (5th Cir. 1990) (citing *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *See Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548; *Wenner,* 123 F.3d at 324. "In such a situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

### B. *Fundamentals of the FMLA*

"The FMLA was enacted to help working men and women balance the conflicting demands of work and personal life. It does so by recognizing that there will be times in a person's life when that person is incapable of performing her work duties for medical reasons." *Price v. City of Fort Wayne,* 117 F.3d 1022, 1024 (7th Cir.1997); *see* 29 U.S.C. § 2601(b)(1) & (2); *Satterfield v. Wal–Mart Stores, Inc.,* 135 F.3d 973, 975 (5th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 72, 142 L.Ed.2d 57 (1998). The FMLA is based in part on Congress's finding that there is " 'inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods.'" *Satterfield,* 135 F.3d at 974–75 (quoting 29 U.S.C. § 2601(a)(4)). The FMLA seeks to accomplish its goals "in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(3).

The FMLA contains two distinct provisions—an entitlements clause and an antidiscrimination clause. *See* 29 U.S.C. §§ 2612, 2615; *Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 159 (1st Cir. 1998). The FMLA provides a series of rights to eligible employees. First, the Act requires covered employers to provide eligible employees up to twelve weeks per year of unpaid leave for any one of the following purposes: the birth, care, or placement of a child for adoption or foster care; to care for a close family member with a serious health condition; or when an employee has a serious health condition that makes the employee unable to perform the functions required by her position. *See* 29 U.S.C. § 2612(a)(1) & (c); *Hodgens,* 144 F.3d at 159; *see also Chaffin v. John H. Carter Co.,* 179 F.3d 316, 319 (5th Cir.1999); *Price v. Marathon Cheese Corp.,* 119 F.3d 330, 333 (5th Cir.1997). Leave taken by an employee for a serious

health condition may be taken intermittently or on a reduced leave schedule when medically necessary. *See* 29 U.S.C. § 2612(b)(1); *Marathon Cheese Corp.,* 119 F.3d at 333. After a qualifying absence, the employer must restore the employee to the same position or to a comparable position as that held by the employee before the leave, with equivalent pay, benefits, and working conditions, and without a loss of accrued seniority. *See* 29 U.S.C. § 2614(a)(1); 29 C.F.R. § 825.100; *Chaffin,* 179 F.3d at 319; *Hodgens,* 144 F.3d at 159; *Marathon Cheese Corp.,* 119 F.3d at 333.

The FMLA also protects employees from retaliation for exercising their rights under the statute. *See* 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220; *Hodgens,* 144 F.3d at 159. The Act provides:

§ 2615. Prohibited acts

(a) Interference with rights

(1) Exercise of rights

It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

(2) Discrimination

It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615(a)(1) & (2). Under these provisions,

[a]n employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave. For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave. By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary ac-

tions; nor can FMLA leave be counted under "no fault" attendance policies.

29 C.F.R. § 825.220(c). "Thus, employers have a prescriptive obligation under the FMLA—they must grant employees substantive rights guaranteed by the FMLA—and they have a proscriptive obligation—they may not penalize employees for exercising these rights." *Chaffin,* 179 F.3d at 319; *see Nero v. Industrial Molding Corp.,* 167 F.3d 921, 927 (5th Cir.1999).

C. *Retaliation Claims under the FMLA*

1. *General Burden of Proof*

 Retaliation claims brought pursuant to the FMLA are analyzed under the same standards that are applied to retaliation claims brought under Title VII and other employment discrimination statutes. *See Chaffin,* 179 F.3d at 319; *King v. Preferred Tech. Group,* 166 F.3d 887, 891 (7th Cir.1999); *Hodgens,* 144 F.3d at 160; *Diaz v. Fort Wayne Foundry Corp.,* 131 F.3d 711, 712–13 (7th Cir.1997); *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997). As with other anti-discrimination statutes, "the employee bears the burden of proving that the employer's actions were motivated by the considerations prohibited by the statute." *Hypes v. First Commerce Corp.,* 134 F.3d 721, 726 (5th Cir.1998). The Fifth Circuit has held that the burden-shifting technique applicable to Title VII disparate treatment claims also applies to claims of unlawful retaliation. *See Long v. Eastfield College,* 88 F.3d 300, 304 (5th Cir.1996) (citing *McMillan v. Rust College, Inc.,* 710 F.2d 1112, 1116 (5th Cir.1983)).

 Therefore, "if the plaintiff can establish a prima facie case of retaliation, the burden shifts to the defendant to come forward with a legitimate, non-discriminatory reason for the adverse employment action." *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1122 (5th Cir.1998); *see Chaffin,* 179 F.3d at 319–20; *Bocalbos v. National Western Life Ins. Co.,* 162 F.3d 379, 383 (5th Cir.1998), *petition for cert. filed* (U.S. June 14, 1999) (No. 99–90);

*Ray v. Iuka Special Mun. Separate Sch. Dist.,* 51 F.3d 1246, 1249 (5th Cir.1995) (citing *Shirley v. Chrysler First, Inc.,* 970 F.2d 39, 42 (5th Cir.1992)); *Grizzle v. Travelers Health Network, Inc.,* 14 F.3d 261, 267 (5th Cir.1994). "If the defendant advances a legitimate reason for the adverse employment action, then the plaintiff must adduce sufficient evidence that would permit a reasonable trier of fact to find that the proffered reason is a pretext for retaliation." *Sherrod,* 132 F.3d at 1122 (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Grizzle,* 14 F.3d at 267); *see Chaffin,* 179 F.3d at 320; *Bocalbos,* 162 F.3d at 383; *Ray,* 51 F.3d at 1249 (citing *Shirley,* 970 F.2d at 42). "If the defendant introduces evidence which, if true, would permit the conclusion that the adverse employment action was nondiscriminatory, the focus shifts to the ultimate question of whether the defendant unlawfully retaliated against the plaintiff." *Long,* 88 F.3d at 305; *see Grizzle,* 14 F.3d at 267. To carry her ultimate burden, "an employee must also show that her employer would not have taken the adverse employment action 'but for' the employee's participation in the protected activity." *Scrivner v. Socorro Indep. Sch. Dist.,* 169 F.3d 969, 972 (5th Cir.1999); *see Walton v. Bisco Indus., Inc.,* 119 F.3d 368, 370 (5th Cir.1997); *Long,* 88 F.3d at 305 n. 4; *Ray v. Tandem Computers, Inc.,* 63 F.3d 429, 435–36 (5th Cir.1995).

### 2. *Prima Facie Case*

■ To establish a *prima facie* case of retaliation under the FMLA, the plaintiff must show that:

(1) she availed herself of a protected right under the FMLA;

(2) she was adversely affected by an employment decision; and

(3) a causal connection existed between the employee's protected activity and the employer's adverse employment action.

*See Hodgens,* 144 F.3d at 161; *Randlett v. Shalala,* 118 F.3d 857, 862 (1st Cir.1997);

*Morgan,* 108 F.3d at 1324; *see also Chaffin,* 179 F.3d at 319; *King,* 166 F.3d at 891; *Bocalbos,* 162 F.3d at 383. The employee must demonstrate that the exercise of her rights under the FMLA was a motivating or determining factor in the adverse employment action taken by the employer, *i.e.,* there must be a causal connection. *See Hodgens,* 144 F.3d at 160; *Hypes,* 134 F.3d at 726. "The burden of establishing the 'causal link' in the prima facie case is much less onerous than the burden of proving 'but-for' causation required for the determination of the ultimate issue of retaliation." *Sherrod,* 132 F.3d at 1122 n. 8; *see Long,* 88 F.3d at 305 n. 4. A plaintiff need not prove that her protected activity was the sole factor in motivating the employer's challenged decision in order to establish the requisite causal link. *See Sherrod,* 132 F.3d at 1122.

### a. *Protected Activity*

■ In the case at bar, it is undisputed that Boriski availed herself of rights protected by the FMLA. The record reflects that she requested and was granted a leave of absence from May 13 to May 28, 1996, to undergo shoulder surgery, which the City classified as FMLA leave. An employee can avail herself of rights under the FMLA even if she is completely ignorant of the benefits conferred by the Act. *See Stoops v. One Call Communications, Inc.,* 141 F.3d 309, 312 (7th Cir.1998). An employee need not expressly mention the FMLA when notifying the employer of the need to take a leave of absence. *See Manuel v. Westlake Polymers Corp.,* 66 F.3d 758, 762–63 (5th Cir.1995). Notice is sufficient "if the employee provides the employer with enough information to put the employer on notice that FMLA-qualifying leave is needed." *Stoops,* 141 F.3d at 312; *see Price,* 117 F.3d at 1025; *see also Manuel,* 66 F.3d at 763. Once circumstances suggest that FMLA leave may be involved, the employer has an obligation to inquire further in order to ascertain specific details. *See Williams v. Shenango, Inc.,* 986 F.Supp. 309, 318 (W.D.Pa.1997). Nonethe-

less, "[w]hile an employer's duty to inquire may be predicated on statements made by the employee, the employer is not required to be clairvoyant.'" *Satterfield,* 135 F.3d at 980 (quoting *Johnson v. Primerica,* No. 94 CIV. 4869(MBM)(RLE), 1996 WL 34148, at *5 (S.D.N.Y. Jan. 30, 1996)). Hence, "[w]hile it is not necessary for an employee to invoke the statute expressly, the information imparted to the employer must be sufficient to give reasonable notice of the request to leave for a serious health condition." *Marathon Cheese Corp.,* 119 F.3d at 335 n. 17 (citing *Manuel,* 66 F.3d at 764).

The FMLA entitles an employee to twelve weeks of unpaid leave during any twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D); *see Chaffin,* 179 F.3d at 319; *Manuel,* 66 F.3d at 761. Under the FMLA, "[t]he term 'serious health condition' means an illness, injury, impairment, or physical or mental condition that involves—

(A) inpatient care in a hospital, hospice, or residential medical care facility; or

(B) continuing treatment by a health care provider."

29 U.S.C. § 2611(11); *see Hodgens,* 144 F.3d at 160; *Satterfield,* 135 F.3d at 975; *Marathon Cheese Corp.,* 119 F.3d at 333–34. Under the regulations construing the FMLA, a "serious health condition" is defined as an illness, injury, impairment, or physical or mental condition that involves:

(1) Inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity (for purposes of this section, defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom), or any subsequent treatment in connection with such inpatient care; or

(2) Continuing treatment by a health care provider.

29 C.F.R. § 825.114(a)(1) & (2); *see Hodgens,* 144 F.3d at 161; *Marathon Cheese Corp.,* 119 F.3d at 334. The Fifth Circuit utilizes a "bright line" test for determining whether an illness qualifies as a "serious health condition:

If an employee is "(1) incapacitated for more than three days, (2) seen once by a doctor, and (3) prescribed a course of medication, such as an antibiotic, she has a 'serious health condition' worthy of FMLA protection."

*Marathon Cheese Corp.,* 119 F.3d at 335 (quoting *Brannon v. OshKosh B'Gosh, Inc.,* 897 F.Supp. 1028, 1036 (M.D.Tenn. 1995)). The Fifth Circuit has also held:

Thus, under the regulation, where an employee alleges that he has a serious health condition involving continuing treatment by a health care provider, he must first demonstrate a period of incapacity (i.e., the inability to work) for at least four consecutive days. Next, he must show that he received subsequent treatment or had a period of incapacity, in which he was either seen at least two times by a health care provider (or a qualified provider of health care services) or obtained a regimen of continuing treatment under the supervision of a health care provider.

*Murray v. Red Kap Indus., Inc.,* 124 F.3d 695, 698 (5th Cir.1997).

In this instance, Boriski received both inpatient care for her shoulder condition at the time of her surgery and continuing treatment by a health care provider during follow-up visits to Dr. Riley and a physical therapist. Prior to her surgery, however, there is no indication that Boriski met the "bright line" test, as there is no evidence that she was incapacitated for in excess of three consecutive days as a result of her shoulder injury. *See id.* Nevertheless, Boriski has satisfied the first prong of a *prima facie* case of retaliation under the FMLA.

b. *Adverse Employment Action*

■ The second element of a *prima facie* case of FMLA retaliation requires a

showing that the plaintiff was adversely affected by an employment decision. *See Chaffin,* 179 F.3d at 319; *King,* 166 F.3d at 891; *Bocalbos,* 162 F.3d at 383; *Hodgens,* 144 F.3d at 161; *Randlett,* 118 F.3d at 862; *Morgan,* 108 F.3d at 1325. It is generally recognized that the employment discrimination statutes were designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions. *See Webb v. Cardiothoracic Surgery Assocs. of N. Tex., P.A.,* 139 F.3d 532, 540 (5th Cir.1998); *Messer,* 130 F.3d at 140; *Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707–08 (5th Cir.), *cert. denied,* 522 U.S. 932, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997); *Dollis v. Rubin,* 77 F.3d 777, 781 (5th Cir.1995); *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981). Ultimate employment decisions include hiring, discharging, promoting, compensating, or granting leave. *See Webb,* 139 F.3d at 539; *Messer,* 130 F.3d at 135; *Mattern,* 104 F.3d at 707. An ultimate employment decision, in itself or through its direct consequences, must effect a material change in the terms or conditions of employment. *See Ledergerber v. Stangler,* 122 F.3d 1142, 1144 (8th Cir.1997). "[E]mployment actions are not adverse where pay, benefits, and level of responsibility remain the same." *Watts v. Kroger Co.,* 170 F.3d 505, 512 (5th Cir.1999).

 " 'Although actions short of termination may constitute an adverse employment action within the meaning of the statute, not everything that makes an employee unhappy is an actionable adverse action.' " *Greaser v. Missouri Dep't of Corrections,* 145 F.3d 979, 984 (8th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 620, 142 L.Ed.2d 559 (1998) (quoting *Manning v.*

*Metropolitan Life Ins. Co.,* 127 F.3d 686, 692 (8th Cir.1997)); *accord Montandon v. Farmland Indus., Inc.,* 116 F.3d 355, 359 (8th Cir.1997); *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir.1996). Interlocutory or mediate decisions, even those that can lead to an ultimate employment decision, are not adverse employment actions for purposes of a retaliation claim under the FMLA or other statutes prohibiting retaliation. *See Mattern,* 104 F.3d at 708. As the Seventh Circuit has explained:

"[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities.... A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."

*Fortier v. Ameritech Mobile Communications, Inc.,* 161 F.3d 1106, 1112 n. 7 (7th Cir.1998) (quoting *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993)); *accord Rabinovitz v. Pena,* 89 F.3d 482, 488 (7th Cir.1996). While one federal district court in Texas, in an unpublished decision addressing an employee's three-day suspension, "hesitate[d] to apply the Fifth Circuit's reasoning in *Mattern* and *Dollis* to an FMLA retaliation action" because the regulations provide that " 'employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions,' " such actions are not implicated in the instant case. *McGarity v. Mary Kay Cosmetics,* No. 3:96–CV–3413–R, 1998 WL 50460, at *4–5 (N.D.Tex. Jan.20, 1998) (quoting 29 C.F.R. § 825.220(c)).

 Indeed, none of the actions about which Boriski complains involves a materially adverse employment decision.[1]

---

1. Boriski's complaints are limited to the following alleged incidents: receiving a performance evaluation on May 9, 1996, for the six-

month period July 17, 1995, to January 16, 1996, in which her attendance, one of twenty-

Despite the purported threats from her supervisors, Boriski was never terminated, suspended, demoted, or placed on probation, nor was her compensation ever reduced. A supervisor's treatment of an employee "rudely and uncivilly does not amount to an adverse employment action." *Webb*, 139 F.3d at 540. Even a "verbal threat of being fired" is not an adverse employment action because of its "lack of consequence." *Mattern*, 104 F.3d at 708. While it may increase an employee's chance that she will eventually suffer an adverse employment action, such a threat, in itself, is not an ultimate employment decision and does not "rise above having mere tangential effect on a possible future ultimate employment decision." *Id.* Similarly, negative performance evaluations, even if undeserved, are not adverse employment actions giving rise to actionable retaliation claims. *See Speer v. Rand McNally & Co.*, 123 F.3d 658, 664 (7th Cir.1997); *Smart*, 89 F.3d at 442; *see also Rabinovitz*, 89 F.3d at 488; *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 896 (10th Cir.1994). "[N]egative performance evaluations, standing alone, cannot constitute an adverse employment action." *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir.1998) (citing *Smart*, 89 F.3d at 442); *accord Dela Rosa v. Scottsdale Mem. Health Sys., Inc.*, 132 F.3d 38, 1997 WL 753359, at *2 n. 3 (9th Cir. Dec.2, 1997), *cert. denied*, —— U.S. ——, 119 S.Ct. 50, 142 L.Ed.2d 38 (1998) (citing *Steiner v. Showboat Operating Co.*, 25 F.3d 1459,

1465 (9th Cir.1994), *cert. denied*, 513 U.S. 1082, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995)); *Montandon*, 116 F.3d at 359. Under these circumstances, because the alleged retaliatory acts about which Boriski complains were not ultimate employment decisions, caused no significant changes in her duties or working conditions, and resulted in no material disadvantages, these acts do not constitute the type of materially adverse employment actions necessary to establish a *prima facie* case of retaliation.

The Fifth Circuit has held a wide array of actions taken by employers, many far more severe than the allegations raised here, not to constitute adverse employment decisions actionable for purposes of a retaliation claim. *See Watts*, 170 F.3d at 511–12 (change in employee's work schedule and being asked to perform tasks not previously assigned are not adverse employment actions); *Messer*, 130 F.3d at 135 (employer's failure to resolve internal grievances, close monitoring of employee's conversations, frequent criticism of employee's work and conduct, failure to heed employee's input, failing to permit employee to represent employer at business functions, and downsizing of employee's department do not constitute ultimate employment decisions); *Mattern*, 104 F.3d at 707–08 (hostility from fellow employees, having tools stolen, visits to employee's home, verbal threats of being fired, reprimands for being away from

six factors assessed, was rated a "2," defined as "Below Expectations;" being required in February 1996 to begin punching a time clock; not being allowed to adjust her work schedule in April 1996 to permit her to attend physical therapy without having to use sick leave or vacation time; one of her supervisors' questioning her husband as to her health and whereabouts; having her personal business discussed during open staff meetings in March 1996; being precluded from attending staff meetings in April 1996; the elimination in April 1996 of one of her job duties, the ordering of office supplies; being instructed in April 1996 not to answer the telephones of other employees when they were away from their desks; Koska's threatening her in April

1996 that she would be terminated if she took off work to attend physical therapy; Koska's yelling at her and demanding doctor's notes in front of other employees in May 1996; being requested to train a fellow employee to perform her job duties prior to her surgery in May 1996; being removed from work-related committees in June 1996; her supervisors' interrogating other employees about her whereabouts when she was away from her desk; her supervisors' sending the employee she had been training to an annual computer seminar rather than her; being asked to furnish medical records to her supervisors; and being threatened by Riley that she would be terminated if she did not stop complaining to the Human Resources Department.

work station, a missed pay increase, and being placed on "final warning" are not actionable); *Dollis,* 77 F.3d at 779, 780, 782 (denial of desk audit which restricted opportunities for promotion, denial of attendance at training conference, provision of false information to employee regarding aspects of assignment, requiring that supervisor approve every document written by employee, and criticism of employee's work to a vendor also do not constitute adverse employment actions); *DeAngelis v. El Paso Mun. Police Officers Ass'n,* 51 F.3d 591, 597 (5th Cir.), *cert. denied,* 516 U.S. 974, 116 S.Ct. 473, 133 L.Ed.2d 403 (1995) (publication of office newsletter routinely ridiculing plaintiff due to her gender and her filing of EEOC charge alleging sexual discrimination found not to be adverse employment action).

Other courts have reached similar conclusions. *See Flannery v. Trans World Airlines, Inc.,* 160 F.3d 425, 428 (8th Cir. 1998) (ordering employee to remove fan from desk, changing her work hours, reprimanding her for dress code violation, moving her parking space, admonishing her for liberally awarding or refunding frequent flyer miles to customers, reassigning her to another work station, and removing approximately 300 complimentary letters and commendations from her personnel file found not to constitute adverse employment actions); *Manning,* 127 F.3d at 692 (employer's hostility and personal animus held not to be ultimate employment actions); *Munday v. Waste Management of N. Am., Inc.* 126 F.3d 239, 244 (4th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998) (yelling at employee during public meeting, directing other employees to ignore her and spy on her, and generally refusing to communicate with her concerning employment-related complaints held not to be actionable adverse employment actions); *Ledergerber,* 122 F.3d at 1144 (reassignment of employee's staff resulting in loss of status and prestige was not ultimate employment decision).

Boriski claims, however, that, as a result of her availing herself of her rights under the FMLA, she was constructively discharged from her employment with the City. In her response to the motion for summary judgment, Boriski lists a series of events, none of which independently constitutes an adverse employment action, that she asserts "made Ms. Boriski's working conditions so intolerable that a reasonable employee would feel compelled to resign." A constructive discharge, if established, is unquestionably an ultimate employment decision as well as an adverse employment action. *See Webb,* 139 F.3d at 539; *Messer,* 130 F.3d at 135; *Mattern,* 104 F.3d at 707.

A constructive discharge occurs when an employer makes an employee's working conditions so intolerable that a reasonable employee would have felt forced to resign. *See Webb,* 139 F.3d at 540; *Faruki v. Parsons S.I.P., Inc.,* 123 F.3d 315, 319 (5th Cir.1997); *Ward v. Bechtel Corp.,* 102 F.3d 199, 202 (5th Cir. 1997); *Barrow v. New Orleans S.S. Ass'n,* 10 F.3d 292, 297 (5th Cir.1994); *Boze v. Branstetter,* 912 F.2d 801, 804 (5th Cir. 1990); *Junior v. Texaco, Inc.,* 688 F.2d 377, 379 (5th Cir.1982); *Young v. Southwestern Sav. & Loan Ass'n,* 509 F.2d 140, 144 (5th Cir.1975). To determine whether a constructive discharge has occurred, the plaintiff's actions must be analyzed from the standpoint of a "reasonable employee." *Boze,* 912 F.2d at 804; *see Bourque v. Powell Elec. Mfg. Co.,* 617 F.2d 61, 65 (5th Cir.1980). The working conditions must have been so difficult or unpleasant that a reasonable person in the plaintiff's shoes would have felt compelled to resign. *See Benningfield v. City of Houston,* 157 F.3d 369, 378 (5th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1457, 143 L.Ed.2d 543 (1999); *McKethan v. Texas Farm Bureau,* 996 F.2d 734, 741 (5th Cir.1993), *cert. denied,* 510 U.S. 1046, 114 S.Ct. 694, 126 L.Ed.2d 661 (1994); *Stetson v. NYNEX Serv. Co.,* 995 F.2d 355, 360 (2d Cir.1993); *Garner v. Wal–Mart Stores, Inc.,* 807 F.2d 1536, 1539 (11th Cir.1987). The challenged working conditions must be viewed

objectively by examining the specific conditions imposed by the employer, not by considering the employee's state of mind. *See Epps v. NCNB Tex.,* 7 F.3d 44, 46 (5th Cir.1993) (citing *Jett v. Dallas Indep. Sch. Dist.,* 798 F.2d 748, 755 (5th Cir.1986), *aff'd in part and remanded in part,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)); *Shawgo v. Spradlin,* 701 F.2d 470, 481 n. 12 (5th Cir.), *cert. denied,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 345 (1983). To prevail, however, the employee need not show that the employer imposed intolerable conditions with the specific intent of forcing the employee to resign. *See Boze,* 912 F.2d at 804; *Jurgens v. EEOC,* 903 F.2d 386, 390 (5th Cir.1990).

In *Barrow,* the court listed some factors relevant, individually or in combination, to the determination of whether a reasonable employee would have felt compelled to resign: "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not." 10 F.3d at 297 & n. 20. "To prove constructive discharge," however, "the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Landgraf v. USI Film Prods. Co.,* 968 F.2d 427, 430 (5th Cir.1992), *aff'd,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *accord Benningfield,* 157 F.3d at 378; *see Weller v. Citation Oil & Gas Corp.,* 84 F.3d 191, 195 n. 7 (5th Cir.1996), *cert. denied,* 519 U.S. 1055, 117 S.Ct. 682, 136 L.Ed.2d 607 (1997); *Robbins v. Fragrance Impressions Ltd.,* 952 F.Supp. 427, 433 (S.D.Tex.1996). "Constructive discharge requires considerably more proof than establishing unpleasant working conditions." *Woodward v. City of Worland,* 977 F.2d 1392, 1402 (10th Cir.1992), *cert. denied,* 509 U.S. 923, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993).

■ Here, Boriski lists a number of occurrences that she contends made her employment unbearable. First, she states in her affidavit that following her injury in 1995, she asked Koska for an adjustment of her work schedule, allowing her to take lunch from 1:00 p.m. to 2:00 p.m. instead of 12:00 p.m. to 1:00 p.m., in order to attend physical therapy, and that Koska denied her request, forcing her to use sick leave or vacation time to go to therapy. Boriski's deposition testimony and her response to Interrogatory Number 7 place this incident on April 7, 1996:

Q. Was there ever an instance in which you asked for time off to see a doctor and were told you could not have time off to go see the doctor?

A. Yes.

Q. Okay. Can you tell me when that happened?

A. ... I asked for therapy—physical therapy and was denied. April 7, 1996.

\* \* \* \* \* \*

I was denied the schedule that the doctor and the physical therapist requested for me for a given week. I was asked to work it around my lunch hour. I instructed them that they were closed on that lunch hour. I made a point to get the closest therapist. And with the result of that being denied, I scheduled one day a week, maybe two days in the morning and used my sick leave and attended it. But not the schedule I was requested or instructed by my doctor.

An examination of the record reveals that Boriski was never actually denied an opportunity to obtain therapy. In another part of her deposition she acknowledged that she began physical therapy in January 1996. In addition, the file contains an e-mail note from Boriski to Koska, dated March 25, 1996, stating, "Fyi I only made it one week in therapy so I didn't need off any over the last month for therapy. It made the injury worse." Furthermore, Koska testified in his deposition that he

permitted Boriski to take off from 1:00 p.m. to 2:00 p.m. for her physical therapy after she requested it. Riley explained in his affidavit that although she was given time off to attend physical therapy, he was concerned about other occasions Boriski missed work:

> She was going to therapy and we had granted that time. So we had asked that any other time to please try to be at work. And we felt that she had neglected that under this situation.

The FMLA makes clear that an employee "shall make a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer." 29 U.S.C. § 2612(e)(2)(A).

There is nothing in the record beyond Boriski's self-serving and conflicting assertions, which are refuted by Koska's and Riley's testimony as well as her own e-mail communications, suggesting that she was not permitted to take time off for therapy. In fact, Boriski admitted at deposition that she had attended therapy, and there is no indication of any disciplinary action ever being taken against her for doing so. Thus, while she may have ultimately ceased attending therapy, there is no competent evidence that it was due to any actions of the City as opposed to her own assessment that "[i]t made the injury worse."

The record also contains e-mail communications from Boriski to Koska reflecting that Boriski took a significant amount of time off for reasons other than therapy and doctors' appointments related to her shoulder, even though she had been warned that she had very little sick leave remaining and not to use it unless absolutely necessary. These messages also show that Boriski was not always diligent in giving adequate advance notice of her absences from work. For example, on February 29, 1996, at 3:53 p.m., when her shift was to end at 5:00 p.m., Boriski notified Koska that she was leaving early to go to the bank for money and then to pick up an anti-inflammatory prescription at the store. On March 5, 1996, she asked Koska

for permission to take off Friday, March 8, 1996, and one-half day on March 15, without giving any reason for her requested absences. On March 14, 1996, at 9:26 a.m., Boriski notified Koska that she was leaving work to take her sister to the hospital because her sister's husband and daughter were unable to take her. Boriski notified Koska on May 9, 1996, at 3:56 p.m., that she was leaving "to meet a woman about an ap[pointment]," stating that she did not take a whole lunch hour that day, presumably to offset in part her leaving work early.

A review of the record further discloses that Boriski did not report to work from Tuesday, July 2 through Monday, July 8, 1996. Koska's file notes indicate that on July 2, 1996, at 3:30 p.m., Koska noticed that he had not seen Boriski at work all day and that he had not been notified of her whereabouts. On July 3, 1996, Koska received a telephone message from Boriski, left at 7:41 a.m. that morning, advising him that she had to go to the doctor for her swollen shoulder and that she would call him later. At 5:00 p.m., however, Koska noted that Boriski had not called him back or returned to work. The next entry in Koska's notes, dated July 8, 1996, indicates that Boriski called him that morning to inform him that she had to go to the hospital to have her hip x-rayed because she had fallen down at the river. She called later that morning to inform him that she would be staying home to rest on the recommendation of the emergency room doctors. As reason would dictate, Koska requested Boriski to "bring in doctor excuses for the days she was off."

Boriski also complains that she was subjected to negative performance reviews relating to her attendance. A performance evaluation signed by Koska on May 9, 1996, for the period July 17, 1995, through January 16, 1996, gave Boriski ratings of "3" ("Meets Expectations") and "4" ("Above Expectations") on twenty-five categories of assessment and a rating of "2"

("Below Expectations") on attendance, along with the following comments:

> This is an area you need to work to improve. You have been away from work a total of 136 hours during the six month period of 7/17/95 to 1/16/96, an equivalent of 17 days. On your last evaluation you were asked for improvement in this area. Since the date of your last evaluation, 9/28/95, you have been away from work a total of 101 hours, an equivalent of 12.6 days. This has been excessive. The effectiveness of the Hansen workorder process has been limited by your extensive absence. Regular attendance is crucial and is required.

In a memorandum dated June 4, 1996, Boriski protested her rating of "2," arguing that the time she had taken off was "prior approved" and was used for therapy and doctor's appointments, but providing no supporting documentary evidence. In any event, as previously noted, there is no evidence in the record that her low attendance rating was accompanied by any disciplinary action.

On her prior evaluation, dated September 28, 1995, long before her FMLA leave, Boriski received a rating of "3" on attendance, but was also cautioned about excessive absenteeism:

> You have taken 56 hours, equivalent to 7 days, off for sick days. Sick leave is a benefit afforded employees and at some point excessive time away from work creates a backup of work and promotes inefficiencies. Your position is [an] extremely important part of this operation and the effects of your absences has a[sic] impact on the Water/Wastewater group efficiencies. I am asking you to make a stronger effort to be at work more often.

A number of courts have recognized that regular attendance at work is an essential element of almost all jobs. *See, e.g., Hypes,* 134 F.3d at 727 (regular attendance is an essential function of most jobs); *Rogers v. International Marine Terminals, Inc.,* 87 F.3d 755, 759 (5th Cir.1996)

(essential element of any government job is an ability to appear for work and to complete assigned tasks within reasonable period of time); *Tyndall v. National Educ. Ctrs., Inc.,* 31 F.3d 209, 213 (4th Cir.1994) (an employee must be willing and able to come to work on a regular basis); *Carr v. Reno,* 23 F.3d 525, 530 (D.C.Cir.1994) ("essential function of any government job is an ability to appear for work"); *Law v. United States Postal Serv.,* 852 F.2d 1278, 1279 (Fed.Cir.1988) ("an agency is inherently entitled to require an employee to be present during scheduled work times"). As Boriski acknowledged at deposition, "if you're not there, you can't perform your work." In this situation, Boriski's performance ratings and her supervisor's comments appear to be deserved, yet "[e]ven an unjustified poor performance rating or demotion does not by itself trigger a constructive discharge." *Lovett v. Vitalink, Inc.,* No. 98–56531, 1999 WL 511954, at *1 (9th Cir. July 16, 1999) (citing *Turner v. Anheuser–Busch, Inc.,* 7 Cal.4th 1238, 32 Cal.Rptr.2d 223, 876 P.2d 1022, 1027 (1994)).

Boriski also asserts that Koska "continually harassed [her] about using sick leave and vacation leave to attend therapy sessions and in October of 1995 he gave me a written reprimand stating that I had engaged in inappropriate use of sick leave." The reprimand, in the form of a Written Counseling Statement dated October 20, 1995, referred to an incident on October 12, 1995, in which Boriski left work after being granted approximately four hours of approved sick leave to pick up her ill son from school and care for him, when, in fact, subsequent investigation proved that the boy had been picked up by his father and was cared for by him that day. The reprimand warned Boriski that this was an inappropriate use of sick leave, that she was "expected to only take off for sick leave when it is absolutely necessary," and that suspension or termination could occur if her attendance did not improve or if she took further inappropriate sick leave. In his December 15, 1995, response to Bori-

ski's October 1995 grievance complaining in part of this reprimand, Riley indicated that the concern about her attendance stemmed from the fact that in the preceding nine months, she had taken personal leave in the amount of 166 hours or 14.5 work days, adding that between October 12, 1995, and the date of the response, Boriski had taken an additional 48 hours, or six days, of personal leave. On February 8, 1996, Woody had the counseling statement removed from Boriski's file, and she was not suspended, terminated, or otherwise adversely affected by the reprimand. Even if she had been adversely affected, such a result could not be viewed as unreasonable, as her lack of candor concerning the purpose of her absence warranted disciplinary action. *See Chaffin,* 179 F.3d at 320–21 (upholding termination of employee seen drinking in bar while on paid leave).

Boriski further contends that following the removal of the October 1995 reprimand from her file, Woody told her that he would advise Koska and Riley to stop harassing her, but that Koska's and Riley's harassment actually became more frequent. As evidence of this harassment, she alleges that "[i]n approximately February of 1996, Mr. Koska ordered [me] to begin punching a time clock, even though no other persons at my level of employment were required to do so." The uncontroverted evidence shows that she and another employee, Tony Hawley, were both asked to begin punching a time clock on February 21, 1996, and, at that time, they were the only employees under Koska's direct supervision who had not been using the time clock. As Koska testified at deposition, "To the best of my recollection, everybody that was under my supervision was required to punch a time clock from that point forwards." Moreover, this occurred almost two months prior to Boriski's letter to Human Resources requesting accommodation and three months before her leave of absence. Thus, Koska's request that she punch a time clock is unrelated to Boriski's exercise of her FMLA rights, as it predates any exercise

of such rights by several months. In any event, requiring a non-exempt employee, such as Boriski, to punch a time clock cannot be deemed so intolerable that a reasonable employee would feel compelled to resign.

Boriski further complains about the following alleged incidents:

b. In approximately March of 1996 Lawrence Carter (another one of my supervisors) began questioning my husband (who also worked for the City of College Station) as to my health and whereabouts;

c. In March of 1996, Mr. Koska and Mr. Riley would discuss my personal business (including the status of my health and my medical appointments) during open staff meetings;

d. In April of 1996, Mr. Koska and Mr. Riley barred me from attending staff meetings, which, until that time, I had always attended;

e. In April of 1996, Mr. Koska took away one of my job duties (i.e. the responsibility for ordering supplies for the office);

f. In April of 1996, Mr. Koska forbid [sic] me from answering the phones of other employees who are away from their desks; and

g. In April of 1996, Mr. Koska threatened to terminate me if I took off work to attend a therapy session.

Boriski has submitted no evidence to corroborate these assertions, nor has she provided any specific examples of such alleged conduct. Koska testified that he never stopped allowing Boriski to attend staff meetings, although he would not call her in for staff meetings that had nothing to do with her area of the department or that were management-related, which she had no reason to attend. Moreover, it was proper for Koska to instruct Boriski not to answer other employees' telephones, as there was no reason for her to learn of the personal business of her co-workers, which could have led to the same types of incur-

sions on their privacy that she now complains about with reference to her supervisors' actions. Likewise, the elimination of her job duty of ordering office supplies was appropriate in light of her frequent absences from the office, as her fellow employees should not have been required to await her arrival to obtain needed office supplies. Furthermore, such a minor reduction in her responsibilities could not possibly be deemed material to a constructive discharge analysis. As discussed previously, the record contains no evidence that Koska or any other supervisor ever took any action to terminate Boriski or otherwise adversely affect her employment. Thus, even if true, these actions are not so abhorrent that a reasonable employee would have felt forced to resign. While perhaps inconsiderate or discourteous, these *de minimis* occurrences are not cognizable under the laws prohibiting employment discrimination. "Hurt feelings, anger and frustration are part of life." *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 940 (5th Cir.1996), *cert. denied*, 519 U.S. 1091, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997).

Boriski maintains that following her request for medical leave to have surgery, "[a]gain, Mr. Koska stepped up the pressure on me by yelling at me in front of other employees and demanding doctor's notes from me in front of other employees." She also complains that Koska told her to begin training Carter to perform her duties, implying, according to Boriski, that she would soon be terminated. The record reflects that Carter was a draftsperson whom Koska requested to be cross-trained "to cover the Hansen workload when Ms. Leinhart was not at work due to her taking extensive sick leave during that time period." Although Carter assumed many of Boriski's duties after her departure, the record reflects that Carter had other job responsibilities and was not, in fact, hired to replace Boriski. "Part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast." *Webb*, 139 F.3d at 539. In view of Bori-

ski's frequent absences, it was eminently reasonable to train another employee to perform her duties when she was gone. Indeed, at deposition, Boriski complained about the lack of a replacement, stating, "if I cannot be there, they should supply somebody to replace me as a reasonable accommodation." Boriski cannot now criticize management for reaching the same conclusion; she simply cannot have it both ways.

Boriski contends that upon her return from leave, Koska "continued to harass and demean" her, removed her from various work-related committees, and if she left her desk for even a minute, would interrogate other employees as to her whereabouts. Koska admitted in deposition that he removed Boriski from one committee, an employee recognition program that was unrelated to her job responsibilities, "because at some point she was missing the meetings and we needed— needed another representation and we moved a different person into that [position] ... which ... often happened. People moved on and off committees." There is no evidence that Boriski was removed from any other committees or that being removed from a committee was sufficiently traumatic to cause a reasonable employee to resign. " '[N]ot every insult, slight, or unpleasantness gives rise to a valid [employment discrimination] claim.' " *Webb*, 139 F.3d at 539 (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1297 (3d Cir.1997)).

Boriski further complains that Koska sent Carter instead of her to an annual computer training seminar that she had attended in previous years. Koska explains in his affidavit that because he is "held accountable to make judicious decision[s] on how training funds are spent," he "made the decision that it would be more beneficial for our organization if I would send Ms. Carter to have a better trained employee as a backup on the Hansen system. During this time I was working to get all employees under my direct

supervision cross-trained." Koska's assessment of the situation appears to be sound, as attending the seminar would likely have been more beneficial to an employee who had only limited exposure to the area and was attempting to increase her knowledge as opposed to an employee who had attended the same seminar on a number of prior occasions.

Furthermore, while Boriski may have disagreed with being asked to cross-train Carter, her removal from the committee, not being sent to the training conference, and the change in her job duties, these were business decisions, which the court will not disturb. *See Walton,* 119 F.3d at 372; *Guthrie v. Tifco Indus.,* 941 F.2d 374, 378 (5th Cir.1991), *cert. denied,* 503 U.S. 908, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992). The employment discrimination laws are "not intended to be a vehicle for judicial second-guessing of employment decisions nor ... to transform the courts into personnel managers." *EEOC v. Louisiana Office of Community Servs.,* 47 F.3d 1438, 1448 (5th Cir.1995) (citing *Bienkowski v. American Airlines, Inc.,* 851 F.2d 1503, 1507–08 (5th Cir.1988)); *Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 959 (5th Cir.1993); *see Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 578, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *Walton,* 119 F.3d at 372; *Waggoner v. City of Garland,* 987 F.2d 1160, 1165 (5th Cir.1993). "Federal Courts 'do not sit as a super-personnel department that reexamines an entity's business decisions ...'" *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991) (quoting *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1365 (7th Cir. 1988)). These actions certainly cannot be considered so reprehensible that a reasonable employee would feel compelled to resign as a result of such decisions.

Boriski also alleges that Riley asked her for copies of her medical records relating to her leave and, after she presented them to him, remarked, "Thanks, I just wanted to see if you had any." Yet, under the FMLA, Boriski's supervisors had the right to request medical records in support of her medical leave. *See* 29 U.S.C. §§ 2613, 2614(a)(4); *Satterfield,* 135 F.3d at 980–81; *Manuel,* 66 F.3d at 763–64. On July 10, 1996, Boriski filed another grievance with the College Station Personnel Department, complaining of harassment, hostile work environment, gender and possibly racial discrimination, and retaliation for filing a previous grievance. She also contends in her affidavit that, after she returned from her leave of absence, "Mr. Riley threatened me with termination if I did not quit complaining to City of College Station's Human Resources Department." According to Boriski, "[t]he final straw came in July of 1996 when I informed Mr. Koska that I needed to leave work early to attend a medical appointment. Mr. Koska told me that if I left work, I would be fired." On that day or within a day or two thereafter, Boriski tendered her resignation. Again, aside from her own self-serving assertions, there is no evidence in the record that supports her allegations. When responding to a motion for summary judgment, bald assertions of impropriety are insufficient to raise material issues of fact. *See Little,* 37 F.3d at 1075; *see also Hart,* 127 F.3d at 435; *Wallace,* 80 F.3d at 1047.

Most significantly, the record establishes that Boriski voluntarily resigned from employment with College Station. In her July 22, 1996, letter of resignation, Boriski wrote:

> TO WHOM IT MAY CONCERN,
>
> I Wendy Leinhart am submitting my letter of resignation with the City of College Station. I leave the City with no wrong doings or ill feelings. I am leaving the City to enhance my career further.

Boriski conceded at deposition that these statements were true: "I left the city in that aspect, and I was going to go enhance my career. The city as a whole, I liked the city. I loved my job." Consistent with her letter of resignation, on her Exit Interview Questionnaire, which Boriski completed on July 29, 1996, she put a check mark next to the line labeled "Voluntary resignation," rather than "Dis-

charged," and checked the following as her reasons for resigning: "Begin job elsewhere," "Moving out of area," "Better Opportunity," "Better Pay," "Better Work conditions," and "Supervision (Immediate)." She listed her new employer as Hansen and the nature of the work as computer training. Boriski also left a handwritten note for Riley and Koska, stating:

Bill/Jeff

I will be going to my dentist, a doctor, and an EAP Counseler [sic] Today, Tuesday & Wednesday. All have to be done while I am Employed before Wednesday 31st. I did not know this until this morning.

I have done my paperwork at City Hall & Exit List Here. My Keys, Card, Radio are attached.

I will be in and out but Amy has been told to call me.

I have no Sick Leave so it is LWOP.

Wendy

12:30

7/29/96

Although Boriski attempts to sidestep the import of these documents, these writings speak for themselves and are strong evidence of a voluntary resignation. They are hardly indicative of an individual who has been repeatedly harassed and forced to resign.

In sum, Boriski has not shown that her working conditions were so difficult or unpleasant that a reasonable person in her shoes would have felt compelled to resign. Her pay was not reduced, she was not suspended or demoted, and she was never encouraged to seek employment elsewhere. Indeed, Boriski was able to endure the working conditions until she lined up a much more lucrative position, paying $38,000.00 annually, rather than the $22,-800.00 per year she was earning at College Station. In fact, Boriski's complaints center on occurrences that do not constitute adverse employment actions as a matter of law. *See Messer,* 130 F.3d at 140; *Harrington v. Harris,* 118 F.3d 359, 366 (5th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct.

603, 139 L.Ed.2d 491 (1997); *Mattern,* 104 F.3d at 707. As the Fourth Circuit has commented:

Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress. The employment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred. They cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting.

*Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986); *see McCann v. Litton Sys., Inc.,* 986 F.2d 946, 952–53 (5th Cir.1993).

Under these circumstances, Boriski has made no showing that a reasonable employee in her situation would have felt compelled to resign due to the nature of the working conditions at College Station. While a reasonable employee would likely have felt compelled to resign to accept the far more attractive position at Hansen, such a decision cannot be attributed to College Station or be deemed a constructive discharge under even the most generous view of the law. Because an actionable retaliation claim requires an adverse employment action, a cognizable claim does not exist where, as here, the plaintiff voluntarily resigns. *See Hartsell v. Duplex Prods., Inc.,* 123 F.3d 766, 775 (4th Cir.1997); *Shealy v. Winston,* 929 F.2d 1009, 1012–13 (4th Cir.1991); *Evans v. Davie Truckers, Inc.,* 769 F.2d 1012, 1014 (4th Cir.1985). "[W]hen an employee voluntarily quits under circumstances insufficient to amount to a constructive discharge, there has been no 'adverse employment action.'" *Hartsell,* 123 F.3d at 775 (citing *Shealy,*

929 F.2d at 1012–13). Accordingly, Boriski cannot establish the second element of a *prima facie* case of retaliation under the FMLA.

### c. *Causal Connection*

The third element that must be shown to establish a *prima facie* case of retaliation is a causal connection between the protected activity and the adverse employment action. *See Chaffin*, 179 F.3d at 319; *King*, 166 F.3d at 891; *Bocalbos*, 162 F.3d at 383. As to the causation element, the Fifth Circuit has commented in the context of a Title VII retaliation case:

> At first glance, the ultimate issue in an unlawful retaliation case—whether the defendant discriminated against the plaintiff *because* the plaintiff engaged in conduct protected by Title VII—seems identical to the third element of the plaintiff's prima facie case—whether a *causal* link exists between the adverse employment action and the protected activity. However, the standards of proof applicable to these questions differ significantly.

*Long*, 88 F.3d at 305 n. 4 (emphasis in original). The court has observed that the consideration of three factors may be helpful in determining whether a causal link has been demonstrated at the *prima facie* case stage: (1) the plaintiff's past disciplinary record, (2) whether the employer followed its typical policies and procedures in terminating the employee, and (3) the temporal relationship between the employee's conduct and discharge. *See Nowlin v. RTC*, 33 F.3d 498, 507–08 (5th Cir.1994) (citing *Jenkins v. Orkin Exterminating Co.*, 646 F.Supp. 1274, 1277 (E.D.Tex. 1986)). "The timing of the adverse employment action can be a significant, although not necessarily determinative, factor." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1092 (5th Cir.1995); *see Hodgens*, 144 F.3d at 168, 170; *Grizzle*, 14 F.3d at 268.

In this instance, Boriski's past disciplinary record was not unblemished. The record reflects that beginning in 1995, her attendance, attitude, and demeanor began to deteriorate. Boriski's performance evaluations reflect some of these areas of concern, especially with regard to her attendance, long before she ever sought a leave of absence under the FMLA. In his deposition, Koska testified that on several occasions, he had to verbally counsel Boriski regarding the way she dealt with conflicts with her co-workers. He also verbally counseled her concerning her insubordinate attitude towards him, including:

> times when she was told that I want— that her supervisor wanted her to do a particular thing and she argued that it wasn't her responsibility or her job to do something or that she was not going to—I don't remember if it was she was going to do something or if it was a condescending attitude that she took towards me giving her a task to do.

Boriski received a written counseling statement on October 20, 1995, regarding her alleged insubordination, excessive use of personal leave, misuse of sick leave, and inappropriate use of sick leave, which was subsequently removed from her file. On December 15, 1995, in responding to her grievance regarding this counseling statement and her claim that Koska had yelled at her, Riley found, after conducting an investigation and speaking with witnesses, that Boriski was the individual being disruptive on the occasion in question and that Koska had raised his voice only to speak over her. Riley advised Boriski:

> Your argumentative behavior and insubordination along with the frivolous grievances and complaints is extremely disruptive, not only to you but also to others in the work place. This behavior will no longer be tolerated. You must understand that your supervisor, in this case Jeff Koska, has the authority to give you directives concerning your work responsibilities, with full expectations of your performance of such.

College Station's business records contain Koska's file notes, dated October 16, 1995, recording incidents in which: (1) Bo-

riski and a co-worker bickered and became disruptive and unprofessional; (2) Koska attempted to set goals with Boriski during a training trip to California, but she became hostile and argumentative, "stating that she had five bosses and they all set goals and none of them followed through with them" and changed the subject; (3) in September 1995, Koska asked Boriski to refrain from using unprofessional language when referring to other employees within hearing range, and Boriski became defensive; and (4) on other occasions, she was disrespectful and sarcastic toward her supervisors. The record reflects that Boriski's insubordination and poor attitude continued through February 1996. Attached to the City's summary judgment evidence is an e-mail from Koska to Boriski regarding an incident in which Boriski, without Koska's permission, took away a co-worker's rights to enter a computer system, causing problems for the co-worker and the department.

As to the second factor, because College Station did not terminate Boriski, its compliance with typical termination policies and procedures cannot be assessed. With respect to the third factor, the temporal relationship, most of the actions about which Boriski complains occurred before she took a leave of absence in May 1996, some more than a year earlier. Thus, College Station cannot be faulted for failing to be clairvoyant and foreseeing that Boriski would ultimately avail herself of rights protected by the FMLA. Consequently, her supervisors were not remiss in expressing concern about her poor attendance record before there was any indication that she would be exercising her rights under the FMLA by seeking a leave of absence. Prior to that time, Boriski's own physician, in a letter dated April 23, 1996, characterized her shoulder difficulties as intermittent, episodic, and infrequent, suggesting no need for a leave of absence or the invocation of FMLA protections.

Moreover, in this situation, any temporal relationship is without probative value, as Boriski fixed the date of her termination by voluntarily resigning from her job with the City and accepting a more desirable position with Hansen. Indeed, she more than doubled her salary within a year and left Hansen only when she was terminated, almost two years after her departure from College Station. Under these circumstances, it cannot be said that "but for" the exercise of her rights under the FMLA, she would not have resigned from her employment with College Station. Therefore, a causal connection between Boriski's termination and the exercise of her rights under the FMLA cannot be inferred.

In the final analysis, Boriski's subjective perception of retaliation is all that remains. It is well established, however, that an employee's own subjective belief of retaliation, no matter how genuine, cannot serve as the basis for judicial relief. *See, e.g., Marathon Cheese Corp.,* 119 F.3d at 337; *Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 42 (5th Cir.1996); *Douglass,* 79 F.3d at 1430; *Ray,* 63 F.3d at 434; *Armendariz v. Pinkerton Tobacco Co.,* 58 F.3d 144, 153 (5th Cir.1995), *cert. denied,* 516 U.S. 1047, 116 S.Ct. 709, 133 L.Ed.2d 664 (1996). As a consequence, Boriski is unable to establish a *prima facie* case of retaliation under the FMLA. Therefore, summary judgment in favor of College Station is mandated.

## IV. *Conclusion*

Accordingly, College Station's Motion for Summary Judgment is GRANTED. Boriski has failed to present a claim that would entitle her to relief. There remain no material facts in dispute, and College Station is entitled to judgment as a matter of law.

IT IS SO ORDERED.